879 A.2d 101

NATIONAL UNION FIRE INSURANCE COMPANY
OF PITTSBURGH, PA., et al.

v.

DAVID A. BRAMBLE, INC.

National Union Fire Insurance Company
of Pittsburgh, PA., et al.

v.

Wadsworth Golf Construction Company of the Midwest.

Nos. 150, 151, Sept. Term, 2004.

Court of Appeals of Maryland.

July 21, 2005.

196

Robert M. Wright (Adam Cizek, Whiteford, Taylor & Preston L.L.P., Baltimore), on brief, for Petitioners.

Edward C. Gallagher, Wickwire Gavin, P.C., Vienna, VA, brief of Amici Curiae, The Surety Association of America and the American Insurance Association in Support of Appellants Urging Reversal of the Court of Special Appeals.

K. King Burnett (David B. Douse, Webb, Burnett, Cornbrooks, Wilber, Vorhis, Douse & Mason, LLP, Salisbury), on brief for Respondent in No. 150, Sept. Term, 2004.

Russell C. Dashiell, Jr. (Widdowson and Dashiell, P.A., Salisbury), on brief for Respondent in No. 151, Sept. Term, 2004.

Elyse L. Strickland, Greg R. Saber, Selzer, Gurvitch, Rabin & Obecny, Chtd., Bethesda, brief of the Amici Curiae, American Subcontractors Association, Inc., D.C. Metropolitan Subcontractors Association, Inc., and ASA of Baltimore, Inc.

Argued Before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and JOHN C. ELDRIDGE (Retired, Specially Assigned), JJ.

BATTAGLIA, Judge.

In the present case we are asked to determine the effect of a general contractor's payment bond surety's failure to fulfill a contractual provision requiring it to answer a subcontractor's payment claim within 45 days after receiving that claim. We determine that the language of the payment bond requires the sureties to delineate those portions of the claim that they intend to dispute within the 45–day period and that, under the language of the bond, a failure to do so results in the entirety of the claim being undisputed. We hold that Wadsworth Golf Construction Company of the Midwest and David A. Bramble, Inc. are entitled to judgment against the sureties because, under the terms of the payment bond, the sureties are precluded from disputing Wadsworth and Bramble's claims, and thereby, we affirm the judgments of the Court of Special Appeals.

## Background

### Common Facts

On November 22, 1999, Clark Construction Group, Inc. ("Clark" or "the general contractor") contracted with Maryland Economic Development Corporation ("MEDCO" or "the owner") to serve as general contractor to oversee the construction of the Hyatt Regency Chesapeake Bay Resort in Cambridge, Maryland.[1] For the purpose of guaranteeing the

---

1. Neither Clark nor MEDCO is a party in the underlying action giving rise to this appeal and neither is involved in the action before this Court.

completion of the construction, Clark executed a surety bond (or "payment bond") in favor of MEDCO in the amount of $70,864,000.00. Issued jointly by National Union Fire Insurance Company of Pittsburgh, PA ("National Union"), Federal Insurance Company ("Federal"), and Fidelity and Deposit Company of Maryland ("Fidelity") (collectively "the sureties"), the payment bond, provided by Clark, was a "form" surety bond, specifically identified as Document A312 from the American Institute of Architects, and was provided by Clark. No alterations were made to the original language of the payment bond.

The payment bond secured Clark's obligation to pay subcontractors for all labor, material, and equipment costs necessary to construct the resort should it default or MEDCO fail to make payment to Clark. Among its many provisions were:

4   The Surety shall have no obligation to Claimants under this Bond until:

4.1   Claimants who are employed by or have a direct contract with the Contractor have given notice to the Surety′ ... and sent a copy, or notice thereof, to the Owner, stating that a claim is being made under this Bond and, with substantial accuracy, the amount of the claim.

\* \* \*

6   When the claimant has satisfied the conditions of Paragraph 4, the Surety shall promptly and at the Surety's expense take the following actions:

6.1   Send an answer to the Claimant, with a copy to the Owner, within 45 days after receipt of the claim, stating the amounts that are undisputed and the basis for challenging any amounts that are disputed.

6.2   Pay or arrange for payment of any undisputed amounts.

### Wadsworth Facts

Eight days after the bond was executed, on November 30, 1999, Clark subcontracted with Wadsworth Golf Construction

Company of the Midwest ("Wadsworth") to build, for over ten million dollars, an 18–hole golf course and to complete excavation and rough grading work for all buildings, parking lots, and roads located on the resort. During the course of construction, the base amount of the contract was increased to over five million dollars, and Clark requested that Wadsworth complete additional work, not included in the base amount, worth $138,714.45.

Wadsworth completed the construction of the golf course and the required site work sometime before March 2002, and Clark made periodic progress payments to Wadsworth as MEDCO paid Clark. When the work was completed, Wadsworth unsuccessfully attempted to collect $720,963.45 still owed by Clark.

On March 23, 2002, Wadsworth notified the sureties by certified letter of its claim under the payment bond for the amount that Clark had failed to pay. Ten days later, Federal Insurance Company responded to Wadsworth's claim, stating:

> Please be advised that American International Group ("AIG") is the lead surety with regard to this matter. As a result, by copy of this letter, I am forwarding a copy of your letter to Susan Hellerman of AIG for her review and investigation and request that she keep me apprised of the status of her investigation.

> Federal Insurance Company writes this letter with a full reservation of its rights and with the understanding that any actions we have taken or may take do not constitute a waiver of any defenses available under the bond or applicable law, including specifically any defenses pertaining to statutes of limitation or timely filing or appropriate notices.

By letter dated April 5, 2002, AIG acknowledged receipt of Wadsworth's claim through a letter addressed to Wadsworth and copied to Clark. AIG requested that Wadsworth document its claim against the payment bond by submission of a completed Proof of Claim form, which was enclosed with the letter, and that Wadsworth attach supporting documentation

such as subcontracts, signed purchase orders, and signed invoices. The letter also stated:

> Please be advised that this action is taken at this time without waiver of or prejudice to any of the rights and defenses, past or present, known or unknown which either the above referenced Surety (National Union Fire Insurance Company) or Principal (The Clark Construction Group, Inc.) may have in this matter.

On May 3, 2002, Wadsworth submitted to AIG the completed Proof of Claim form and copies of the subcontract, billing and payment documentation, and notice letters. Shortly thereafter, AIG notified Wadsworth by letter that it had received the documents, and that it would "immediately take[ ] this matter up with the above referenced Principal (The Clark Construction Group, Inc.), in order to ascertain their position on [the] claim as presented." The letter further stated: "[AIG] will be in contact with you in due course regarding [Clark's] position on the Proof of Claim as presented by your company on the above reference bond." Wadsworth, however, received no further information from AIG or the sureties regarding its claim, despite having sent a second letter, on July 23, 2002, requesting an answer to its claim.

On November 6, 2002, Wadsworth filed a single count complaint in the Circuit Court for Dorchester County against the sureties. The complaint alleged breach of contract and sought $752,738.72 under the payment bond for labor and materials for which Clark did not pay, plus pre- and post-judgment interest.[2] That same day, Wadsworth also filed a motion for summary judgment, arguing that the sureties were not entitled to challenge its claim under the payment bond because the sureties had not answered Wadsworth's claim and had delineated the grounds for dispute here and the amounts within 45 days of receiving it. Wadsworth appended the affidavits of its vice-president, Brian R. Cunfer, and attorney,

---

2. Wadsworth later voluntarily reduced this amount to $720,963.45. At the subsequent motions hearing, Wadsworth did not request, and the court did not award, pre-judgment interest.

Stephen P. Lagoy, to its Motion, which verified the accuracy of the exhibits attached to the proof of claim and attested to their knowledge of the allegations in the complaint.

In response, the sureties filed a motion to stay the proceedings pending the outcome of litigation that Clark had instituted against MEDCO. The sureties also filed a cross-motion for summary judgment, raising two grounds for relief: (1) pursuant to Article 4.j. of the subcontract, the money Clark owed to Wadsworth was not yet payable because MEDCO had not paid Clark; and (2) the sureties' payment obligation under the terms of the payment bond arose only when Clark failed to pay amounts due at the time the claim was submitted. Appended to the sureties' motion was the affidavit of Michael Mansager, employed by Clark as the Project Executive responsible for the management and oversight of Clark's contract with MEDCO, who averred that Clark had paid Wadsworth "all sums currently due and owing."

On April 28, 2003, a hearing on the motions was held at which time Judge Marvin Smith, sitting by special assignment, granted the motion on alternative grounds, the first being that Wadsworth was entitled to the money under the terms of the bond, and the second being public policy. A written order embodying the court's judgment was subsequently entered on the docket on May 5, 2003. On May 28, 2003, the sureties filed a notice of appeal to the Court of Special Appeals.

The Court of Special Appeals affirmed Judge Smith's conclusion that the bond language operated to preclude the sureties from disputing the claims submitted by Wadsworth due to their failure to comply with Paragraph 6 of the payment bond because Paragraph 6 "provides the surety 45 days to dispute a subcontractor's claim for payment and, if the surety does not answer within that time period," the surety cannot thereafter dispute the claim. *National Union Fire Insurance Co. of Pittsburgh v. Wadsworth Golf Construction Company of the Midwest,* 160 Md.App. 257, 274, 863 A.2d 347, 357 (2004). Moreover, the opinion noted that its construction of Paragraph 6 was consistent with the purpose of such bonds,

which is to "insure that claimants who perform work are paid for their work in the event that the principal does not pay." *Id.* The court concluded that to interpret Paragraph 6 otherwise would render the provision nugatory. Because the sureties did not appeal from the alternative ground for Judge Smith's determination, public policy, the Court of Special Appeals did not address that ground.

## Bramble Facts

On May 16, 2000, Clark subcontracted with David A. Bramble, Inc. ("Bramble") to provide water and sewer piping systems at the resort. The subcontract provided that Clark would pay Bramble a base price of $2,055,00.00, which was increased by $400,000.00 during the construction process. Bramble completed the required site work in March of 2002, at which time Bramble unsuccessfully attempted to collect the monies that it believed were outstanding from Clark.

On June 14, 2002, Bramble notified the sureties by letter of its claim for payment under the bond, in the amount of $455,511.53. Nearly one month later, Federal responded to Bramble's claim by sending a letter that was identical in content to that sent to Wadsworth, stating that it forwarded the claim to the lead surety, AIG. At some point thereafter, AIG requested that Bramble document its claim under the payment bond by submitting a completed Proof of Claim form along with materials supporting its assertion. On April 22, 2003, Bramble submitted the form to AIG.

On April 25, 2003, AIG informed Bramble by letter that the amount of the claim should be reduced to $336,334.63. Bramble received no additional correspondence from the sureties regarding its claim until after suit was filed. At the end of April, Bramble filed a single count complaint in the Circuit Court for Dorchester County against the sureties alleging breach of contract and seeking $500,000.00 [3] in damages, plus pre-judgment and post-judgment interest. Bramble then filed

---

3. The request for $500,00.00 was thereafter reduced to $327,035.13.

a motion for summary judgment, which the sureties opposed. In a hearing on June 12, 2003, Judge Smith granted summary judgment in favor of Bramble relying on his holding in *Wadsworth*. The sureties filed a timely appeal with the Court of Special Appeals presenting questions identical to those in the *Wadsworth* case. In an unreported opinion, the Court of Special Appeals, relying entirely upon its reasoning in *Wadsworth*, affirmed the entry of summary judgment.

The sureties filed a petition for a writ of certiorari on January 14, 2005 in both cases and presented the following question, which we have reformulated for clarity purposes:

Whether the Circuit Court improperly granted Wadsworth and Bramble's Motions for Summary Judgment based on the terms of Paragraph 6 of the payment bond, which requires the sureties to answer a submitted claim within 45 days of receipt and detail the amounts which are disputed and which are not.

On March 11, 2005, we granted the petitions and issued the writs. *National Union v. Wadsworth*, 385 Md. 511, 869 A.2d 864 (2005); *National Union v. Bramble*, 385 Md. 511, 869 A.2d 864 (2005). Because we determine that the language of Paragraph 6 of the payment bond requires that the sureties answer a subcontractor's claim and delineate the portions of the claim that they intend to dispute within 45 days after the claim is submitted and that the sureties failed to do so, we find that Wadsworth and Bramble are entitled to judgment under the bond and affirm the judgments of the Court of Special Appeals. Our determination, like that of the Circuit Court, is based solely on an interpretation and application of the language of the payment bond.

### Discussion

Primarily, the sureties contend that their failure to answer Wadsworth and Bramble's claims within the 45–day period set forth in Paragraph 6 indicates that the entirety of the claims were being disputed. They argue that if they are not able to dispute the claim of the subcontractor, then they could be forced to make payment for claims not properly covered by

the bond. Moreover, the sureties assert that to determine otherwise could result in the subcontractors receiving a windfall at the expense of other legitimate claimants entitled to recover under the terms of the bond. The sureties suggest that it would be more appropriate to award the subcontractors consequential damages arising from the breach of contract. Finally, the sureties contend that the result of the Circuit Court's grant of summary judgment is punitive and inconsistent with the long standing principle in Maryland law prohibiting the courts from expanding the scope of a bond or insurance policy.

Conversely, Wadsworth and Bramble assert that Judge Smith's determination that the plaintiffs were entitled to recover was supported by the facts adduced in support of their motions for summary judgment. Wadsworth and Bramble argue that because the sureties breached the provision of the contract governing the procedures for investigating claims, the sureties were precluded from raising any defense on the merits relating to coverage or otherwise. Therefore, Wadsworth and Bramble assert that Judge Smith properly granted their motions.

### The History and Fundamental Principles of Suretyship

[1]  At the outset, we shall examine our understanding of the fundamental principles governing surety bonds. A surety bond is a "tripartite agreement among a principal obligor, his obligee, and a surety." *General Motors Acceptance Corp. v. Daniels,* 303 Md. 254, 259, 492 A.2d 1306, 1309 (1985); *Atlantic Contracting & Material Co., Inc. v. Ulico Casualty Co.,* 380 Md. 285, 299, 844 A.2d 460, 468 (2004). It is a "three party arrangement intended to provide personal security for the payment of a debt or performance of an obligation." William H. Woods, *Historical Development of Suretyship from Prehistoric Custom to a Century's Experience with the Compensated Corporate Surety, in* THE LAW OF SURETYSHIP 3 (Edward G. Gallagher ed., 2000). Baldwin's Century Edition of *Bouvier's Law Dictionary* (1948) defines "surety" as: "A person who

binds himself for the payment of a sum of money, or for the performance of something else, for another."

Uncompensated personal suretyship "was the dominant form of security in early Rome ... [and Roman law] provided the surety with certain unique rights and defenses in order to encourage individuals to voluntarily undertake the risks inherent in this form of security." *Woods, supra,* at 6. A personal surety was not compensated and "was motivated by duty rather than profit." *Id.* Traditional uncompensated personal suretyship was also preeminent in England and was governed by three distinct legal traditions: the Common Law, Equity, and the Law Merchant, the commercial common law.[4] *Id.* at 8. In the American colonies, the law of suretyship was plagued with often conflicting and unsettled rules emanating from these diverse bodies of English law. *Id.* at 20. Because the colonies were not "important centers of international trade with established mercantile customs," the principles governing suretyship adopted in England were not widely used. *Id.* at 21. It was not until the nineteenth century that a significant need for suretyships developed in the United States.

Compensated corporate suretyship by contract, which is the form of suretyship present in the case at bar, originated in England prior to the American Revolution. *Id.* at 26. In 1837, William L. Haskins, an American, published a pamphlet entitled, "Considerations on the Project and Institution of a Guarantee Company, on a New Plan, with some general views on Credit, Confidence and Currency" in which "the organization of a company named, 'The New York Guarantee Co.' was proposed." *Id.* at 27, quoting Willis D. Morgan, *The History and Economics of Suretyship,* 12 Cornell L.Q. 153, 164–65 (1926). Haskins stated the purpose of his company as "to guarantee the payment of notes and other written obligations or contracts, whether of individuals, corporations, or private associations." *Id.* Thus, Haskins has been credited with

---

4. The Law Merchant denotes the English unwritten body of law that developed from the "unrecorded customs and practices of the merchants." *Woods, supra,* at 8.

having "first conceived of the [compensated] corporate surety." *Id.* American Surety Co., the first company in the United States devoted exclusively to surety underwriting, was incorporated in New York on April 14, 1884, and in 1887, was the first United States corporation to write a contract surety bond. *Id.*

With the emergence of the compensated corporate surety as a business entity, it was necessary to create rules of interpretation for surety bonds. Shortly after the turn of the twentieth century, this Court indicated that a surety "whose obligation is deliberately entered into, as a commercial transaction, and with the exclusive view to the pecuniary profit resulting from it," *Smith v. Turner,* 101 Md. 584, 587–88, 61 A. 334, 336 (1905), might expect to receive treatment different from that which had been afforded an uncompensated personal surety, which was favored by the law. Subsequently, the principle was explicitly stated in *Southern Md. Nat'l Bank v. Nat'l Surety Co.,* 126 Md. 290, 94 A. 916 (1915):

> The doctrine that a surety is a favorite of the law, and that a claim against him is *strictissimi juris*[5] does not apply where the bond or undertaking is executed upon consideration by a corporation organized to make such bonds or undertakings for profit.

*Id.* at 293, 94 A. at 916 (footnote added). Furthermore, in *A/C Electric Co., Inc. v. Aetna Insurance Co.,* 251 Md. 410, 416, 247 A.2d 708, 711–12 (1968), quoting *Maryland Cas. Co. v. Fowler,* 31 F.2d 881, 884 (4th Cir.1929), we stated:

> 'The rule is well settled . . . that a compensated surety is in effect an insurer, that its contract will be construed as an insurance contract most strongly in favor of the party or parties protected thereby, that forfeiture on technical grounds will not be favored, and that the *strictissimi juris* rule of the law of suretyship will not be applied for its protection.'

---

**5.** *Strictissimi juris* is a term of art meaning "to be interpreted in the strictest manner." Black's Law Dictionary, "strictissimi juris" (8th ed.2004).

In *Berry v. United States Fidelity & Guaranty Co.*, 249 Md. 150, 157, 238 A.2d 907, 910 (1968), this Court noted that:

A paid surety which is a surety or bonding company is usually considered to be in the same class as an insurance company, its contract being held to be in the nature of insurance and to be construed according to the rules applicable to insurance contracts.

*Id.*

### Interpretation of Paragraph 6

In *Dutta v. State Farm Insurance Co.*, 363 Md. 540, 556, 769 A.2d 948, 957 (2001), we addressed the principles applicable to the interpretation of surety bonds. "In the interpretation of the meaning of an insurance contract, we accord a word its usual, ordinary and accepted meaning unless there is evidence that the parties intended to employ it in a special or technical sense." *Id.* at 556, 769 A.2d at 957, quoting *Cheney v. Bell National Life Insurance Co.*, 315 Md. 761, 766, 556 A.2d 1135, 1138 (1989). Consistent with that observation, insurance contracts are construed as ordinary contracts. *Id.*, citing *Litz v. State Farm*, 346 Md. 217, 224, 695 A.2d 566, 569 (1997); *North River Insurance Co. v. Mayor & City Council of Baltimore*, 343 Md. 34, 39, 680 A.2d 480, 483 (1996). Ordinary principles of contract interpretation apply. *Kendall v. Nationwide Insurance Co.*, 348 Md. 157, 165, 702 A.2d 767, 770–71 (1997). Accordingly, if no ambiguity in the terms of the insurance contract exists, a court will enforce those terms. *Id.* at 171, 702 A.2d at 773. Therefore,

[a] court construing an agreement under this test must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated. In addition, when the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed. In these circumstances, the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have

thought it meant. Consequently, the clear and unambiguous language of an agreement will not give [ ]way to what the parties thought that the agreement meant or intended it to mean.

*Wells v. Chevy Chase Bank, F.S.B.,* 377 Md. 197, 224–25 n. 12, 832 A.2d 812, 828 n. 12 (2003). Moreover, this Court has adhered to the principle that we will not unnecessarily read contractual provisions as meaningless:

A recognized rule of construction in ascertaining the true meaning of a contract is that the contract must be construed in its entirety and, if reasonably possible, effect must be given to each clause so that a court will not find an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed.

*DirecTV, Inc. v. Mattingly,* 376 Md. 302, 320, 829 A.2d 626, 637 (2003), quoting *Sagner v. Glenangus Farms, Inc.,* 234 Md. 156, 167, 198 A.2d 277, 283 (1964). *See also Bausch & Lomb, Inc. v. Utica Mut. Ins. Co.,* 330 Md. 758, 782, 625 A.2d 1021, 1033 (1993); *Dahl v. Brunswick Corp.,* 277 Md. 471, 478–79, 356 A.2d 221, 226 (1976).

In the present case, Paragraph 6 of the payment bond states:

When the Claimant has satisfied the conditions of Paragraph 4 [furnished written notice to the Contractor and sent a copy, or notice, to the Owner within 90 days after work was completed and when not paid within 30 days, sent a notice to the Surety and Owner stating that a claim is being filed under the bond], the Surety shall promptly and at the Surety's expense take the following actions:

6.1 Send an answer to the Claimant, with a copy to the Owner, within 45 days after receipt of the claim, stating the amounts that are undisputed and the basis for challenging any amounts that are disputed.

6.2 Pay or arrange for payment of any undisputed amounts.

The sureties do not contest the fact that they breached the requirements of Paragraph 6. Instead, they argue that when they failed to answer within the 45–day period of Paragraph 6, the entirety of the claim was disputed. We disagree.

The language of Paragraph 6.1 requires the sureties to do three things: answer the Claimant's claim, define what amounts are undisputed, and list the bases for challenging the payment of any amounts that are disputed. This language necessarily required the sureties to communicate with Wadsworth and Bramble, with a copy of the correspondence to the owner, concerning what portions of the submitted claim are subject to dispute. Although the lead surety, AIG, responded to Wadsworth and Bramble's claims, acknowledging receipt, the sureties failed to explicate which parts of the claims were disputed and undisputed as mandated by the language of the bond within the time allotted.

To satisfy Paragraph 6.1, the sureties were required to, in their answer, state the amounts that were undisputed and the basis for challenging the claims that were disputed. Although the sureties corresponded with Wadsworth and Bramble during the 45–day period set forth in Paragraph 6.1, the record contains no evidence that the sureties attempted to comply with the language of the bond. The sureties argue that because they failed to explicate both the amounts that are undisputed and those subject to challenge, the function of the paragraph is to render the entirety of the claim in dispute. Paragraph 6 does not, however, simply require that the sureties state which portions of the claim are disputed and which are not; they must also specifically delineate the grounds underlying the dispute. This places a greater burden on the sureties with respect to those amounts they wish to challenge as compared to those parts of the claim that are undisputed, the latter of which the sureties must only list. Therefore, it would not be consistent with the plain meaning of the provisions of Paragraph 6 to interpret it to permit the sureties to dispute a claim in its entirety through inaction.

If we were to adopt the sureties' interpretation of Paragraph 6, we would be rendering the 45–day time requirement essentially nugatory. This runs afoul of our long-standing tenet of contractual interpretation that provisions of a contract are to be interpreted, if possible, so as to give effect to all. *DirecTV, Inc. v. Mattingly*, 376 Md. 302, 320, 829 A.2d 626, 637 (2003), quoting *Sagner v. Glenangus Farms, Inc.*, 234 Md. 156, 167, 198 A.2d 277, 283 (1964). *See also Bausch & Lomb, Inc. v. Utica Mut. Ins. Co.*, 330 Md. 758, 782, 625 A.2d 1021, 1033 (1993); *Dahl v. Brunswick Corp.*, 277 Md. 471, 478–79, 356 A.2d 221, 226 (1976). The primary purpose of Paragraph 6 is to better facilitate the timely payment of claims under the bond, as we recently delineated:

> The reasonable behavior required of a surety acting in good faith is not meant to foster reluctance on a surety's part to satisfy bond claims. We agree with the court in *General Accident Insurance Co. of America v. Merritt–Meridian Construction Corp.*, 975 F.Supp. 511, 516 (S.D.N.Y.1997), which explained:
>
> > Sureties enjoy such discretion to settle claims because of the important function they serve in the construction industry, and because the economic incentives motivating them are a sufficient safeguard against payment of invalid claims. The many parties to a typical construction contract—owners, general contractors, subcontractors, and sub-subcontractors—look to sureties to provide assurance that defaults by any of the myriad other parties involved will not result in a loss to them. Courts have recognized that 'as a practical matter the suppliers and small contractors on large construction projects need reasonably prompt payment for their work and materials in order for them to remain solvent and stay in business.' (Citations omitted)

*Atlantic Contracting*, 380 Md. at 314, 844 A.2d at 476–77. In *Moore Bros. Co. v. Brown & Root, Inc.*, 207 F.3d 717, 723 (4th Cir.2000), the United States Court of Appeals for the Fourth Circuit similarly stated the purpose of such bonds:

> [T]he very purpose of securing a surety bond contract is to insure that claimants who perform work are paid for their work *in the event that the principal does not pay.* To suggest that non-payment by the Owners absolves the surety of its obligation is nonsensical, for it defeats the very purpose of a payment bond.

(Emphasis in original).

The 45–day time period and the specificity of the procedures to dispute a claim as mandated in Paragraph 6 of the payment bond directly embody that purpose. To decide that the sureties, by inaction through time and effort, could dispute the entirety of a claim *ad infinitum,* would greatly undermine the bond's purpose of safeguarding those entities that supply goods and labor to the general contractor. The requirements of Paragraph 6 function to insure that subcontractors and sub-subcontractors are not forced to absorb the risk of non-payment over a protracted period by the contractor and the owner, through no fault of their own.

██ A paid surety is classified as an insurance company, and as such, courts tend to construe contracts involving compensated sureties in favor of the party who benefits under the bond. *A/C Electric Co.,* 251 Md. at 418, 247 A.2d at 712. In the present case, the sureties are compensated corporate sureties. Therefore, to construe the language of Paragraph 6 in a manner favorable to the party whose interests are protected by the bond is proper under Maryland law. Our determination is consistent with that tenet.

██ The sureties argue that such an interpretation results in a potential expansion of the coverage of the bond because they would be forced to pay for claims that are beyond the scope of the bond's coverage. Although we recognize that we may not take action to expand the coverage of a bond through judicial action, *see Mayor & City Council of Baltimore v. Fidelity and Deposit Co. of Maryland,* 282 Md. 431, 441, 386 A.2d 749, 754 (1978), there is nothing in the record to indicate that the sureties asserted that any portion of Wadsworth and Bramble's claims was beyond the scope of the bond's coverage

within the 45–day period delineated in Paragraph 6. By the plain language of the bond, the sureties are precluded from arguing otherwise. Therefore, the Circuit Court correctly granted summary judgment in favor of Wadsworth and Bramble.

### Conclusion

Under the terms of Paragraph 6, the sureties were required to delineate which portions of Wadsworth and Bramble's claim were disputed and failed to do so. Therefore, the effect of the provisions in Paragraph 6 is that the entirety of the claim is undisputed and the sureties are required to promptly pay the claims submitted by Wadsworth and Bramble. Thus, we affirm the judgments of the Court of Special Appeals.

*JUDGMENTS OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN BOTH COURTS TO BE PAID BY PETITIONERS.*