PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 10-1725 & 10-1765
_____

SLOAN & COMPANY

Appellant (10-1765)

v.

LIBERTY MUTUAL INSURANCE COMPANY,

Appellant (10-1725)
_____

On Appeal from the United States District Court
For the Eastern District of Pennsylvania
(D.C. Civil Action No. 2-07-cv-05325)
District Judge:  Honorable Berle M. Schiller
_____

Argued March 7, 2011
_____

Before:  SCIRICA, AMBRO,
and VANASKIE, Circuit Judges

(Opinion filed:  August 1, 2011)

Robert L. Byer, Esquire (Argued)
Susan G. Schwochau, Esquire
Duane Morris
600 Grant Street, Suite 5010
Pittsburgh, PA   15219-0000

Robert M. Palumbos, Esquire
Robert A. Prentice, Esquire
Duane Morris
30 South 17th Street, United Plaza
Philadelphia, PA   19103-4196

  *Counsel for Appellant/Cross-Appellee*
  *Liberty Mutual Insurance Company*

Samuel J. Arena, Jr. Esquire
Neal R. Troum, Esquire
Stradley, Ronon, Stevens & Young
2600 One Commerce Square
2005 Market Street
Philadelphia, PA  19103-7098

  *Counsel for Amicus Appellant,*
  *The Surety & Fidelity Association of America*

Rudolph Garcia, Esquire (Argued)
Joseph R. Loverdi, Esquire
H. Marc Tepper, Esquire
Buchanan Ingersoll & Rooney
50 South 16th Street
Two Liberty Place, Suite 3200
Philadelphia, PA   19102-2555

*Counsel for Appellee/Cross-Appellant*
*Sloan & Company*

_____

OPINION  OF  THE  COURT
_____

AMBRO, <u>Circuit Judge</u>

This case involves principally the interpretation of a construction subcontract.  A dispute arose when a general contractor, Shoemaker Construction Company ("Shoemaker"), failed to pay a subcontractor, Sloan & Company ("Sloan"), the remaining balance on its subcontract. The appellant in this case, Liberty Mutual Insurance Company ("Liberty Mutual"), is the surety on the subcontract and the party Sloan has sued for payment on the surety bond. Sloan cross-appeals with respect to one aspect of its claim. For the reasons that follow, we reverse in part and remand for further proceedings consistent with this opinion as to Liberty Mutual's appeal, and affirm the ruling on Sloan's cross-appeal.

## I.  Background

Isla of Capri Associates LP ("IOC") owned and developed waterfront condominiums in Philadelphia. Shoemaker contracted with IOC to build the project (the "prime contract").  Shoemaker then lined up various subcontractors that included Sloan, who agreed to perform drywall and carpentry work on the project (the "subcontract").  Payment for the subcontractors' work was insured by a surety bond issued by Liberty Mutual.  At the

3

project's completion, IOC refused to pay Shoemaker nearly $6.5 million owed under the prime contract. Of that amount, $5 million was due the subcontractors. IOC claimed it was withholding money for several reasons, one of which was that some of the subcontractors' work was untimely and deficient.[1] Shoemaker then refused to pay Sloan the full amount of the remaining balance Sloan claimed was due under their subcontract—$1,074,260.

In May 2007, Shoemaker sued IOC to recover the balance on the prime contract. Sloan then made a claim against Liberty Mutual for payment on the surety bond. Five weeks later, Liberty Mutual denied the claim in its entirety, reserving all rights and defenses. As a ground for denying any payment obligation to Sloan, Liberty Mutual asserted that one of the subcontract's terms, found in Paragraph 6.f, conditioned Sloan's right to payment on Shoemaker's receipt of payment from IOC. Relying on that interpretation of the subcontract, Liberty Mutual claimed that Sloan was not entitled to payment from Shoemaker because IOC had not paid Shoemaker.

In December 2007, Sloan filed a complaint against Liberty Mutual in the District Court. Sloan moved for summary judgment in the amount of $1,074,260.09, plus interest and taxable costs. Liberty Mutual cross-motioned for summary judgment. It argued that even if Sloan were entitled to payment, the amount at most was $785,067 because of

---

[1] IOC deducted $418,392 from Sloan's claim for payment because it identified Sloan as one of the subcontractors who were "bad actors." A1018.

4

various offsets.  Sloan's claim, and Liberty Mutual's alleged offsets, broke down as follows:

| | Sloan's Claim | Liberty Mutual's Alleged Offsets | Undisputed Amount in Controversy |
|---|---|---|---|
| | $1,074,260 | | |
| Legal fees (attributable to Sloan) | | $16,579[2] | |
| Repairs | | $40,370 | |
| Deficiencies | | $24,600 | |
| Time & Materials Provided | | $66,324 | |
| Lump Sum Proposals Performed | | $141,320 | |
| **Subtotal of offsets claimed** | | $289, 193 | |
| | | | $785,067 |

---

[2] In its second cross-motion for summary judgment, Liberty Mutual claimed that this amount was much higher.

Meanwhile, Shoemaker's lawsuit against IOC hit a dead end. Shoemaker learned that IOC's financial situation made it unable to satisfy a judgment for the entire claim even if one were awarded to Shoemaker. It entered into a settlement agreement with IOC for $1 million, apparently all that IOC was able to pay.[3] Shoemaker offered its subcontractors their *pro rata* share of amounts owed in exchange for a release of claims, but Sloan did not agree to that arrangement and continued to press its suit against Liberty Mutual.[4]

In August 2009, the District Court granted partial summary judgment in favor of Sloan for $785,067 (the "First Judgment"). It rejected Liberty Mutual's interpretation of the subcontract as conditioning Sloan's right to payment on IOC's payment to Shoemaker. The Court allowed the parties to conduct additional discovery as to whether Sloan was entitled to any additional amounts.

---

[3] Liberty Mutual represented that Shoemaker had spent over $3 million pursuing payment from IOC and, at the time of oral argument, IOC had paid only $300,000 of the agreed settlement.

[4] Prior to this, Liberty Mutual had moved for a dismissal or stay of Sloan's suit based on a provision of the subcontract in which Sloan "agree[d] to [wait to] pursue its claim against the Contractor or its surety until the Contractor Dispute Resolution and all appeals thereto are completed and become final." On information that Shoemaker's case was settled, Sloan moved to lift the stay and for entry of summary judgment.

After discovery, the parties again moved for summary judgment. The Court granted partial summary judgment in favor of Sloan on the issue of legal fees and deficiencies, and awarded prejudgment interest (on that amount as well as on the previous sum awarded—$785,067), for an additional sum aggregating $145,895 (the "Second Judgment").[5]

In lieu of trial on the remaining amounts, the parties stipulated to the entry of a third and final judgment in favor of Sloan on February 12, 2010 (the "Final Judgment"). Included within the Final Judgment were sums set forth in the First Judgment, the Second Judgment, and the additional amount of $179,876 ($156,224, plus prejudgment interest of $23,652).[6] The combined amounts in the Final Judgment (excluding interest) were $91,790 less than Sloan's initial claim of $1,074,260.

The parties agreed to preserve their rights to appeal all three of the District Court's judgments, and Liberty Mutual does so, challenging the District Court's interpretation of the subcontract. It argues that Shoemaker's obligation to pay

---

[5] The principal amount of this judgment was $41,179.

[6] The Final Judgment dealt with the remaining amounts in dispute. Per the parties' stipulation, that judgment deducted nothing for repairs, $11,430 for time and materials provided, and $80,361 for lump sum proposals performed. We take from the parties' briefs that only the propriety of these deductions is challenged, but not their amounts. Therefore, we address only whether Liberty Mutual was entitled to argue for these deductions.

Sloan was conditioned on its receipt of payment from IOC, or, put another way, Sloan was entitled to be paid only whatever amount Shoemaker received from IOC for Sloan's work. Liberty Mutual also contests the District Court's determination on litigation costs. It argues it is entitled to deduct Sloan's share of the legal fees stemming from Shoemaker's suit against IOC. In addition, Sloan cross-appeals the $91,790 shortfall from its initial claim. It argues that Liberty Mutual waived the right to claim offsets by failing to state their bases within 45 days of Sloan's initial claim.[7]

## II. Discussion

Summary judgment is in order when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Our review over the District Court's grant of summary judgment is plenary. *Lawrence v. City of Phila.*, 527 F.3d 299, 310 (3d Cir. 2008). We also exercise plenary review over the District Court's interpretation of state law. *Emerson Radio Corp. v. Orion Sales, Inc.*, 253 F.3d 159, 162 (3d Cir. 2001).

## A.     The Contract

The crux of the dispute is Paragraph 6.f of the subcontract, which deals with final payment. Thus, to resolve

---

[7] The District Court had jurisdiction based on the diversity of the parties' citizenship. 28 U.S.C. § 1332. We have jurisdiction over the District Court's rulings under 28 U.S.C. § 1291.

the dispute, we begin by considering in detail the language and structure of that provision.

It contains two subparagraphs. The first provides in relevant part: "Final payment shall be made within thirty (30) days after the last of the following to occur, the occurrence of all of which shall be conditions precedent to such final payment . . . ." That subparagraph then lists those conditions precedent (seven in all), one of which (condition three) is that "[IOC] shall have accepted the Work and made *final* payment thereunder to [Shoemaker]" (emphasis added). Another (condition six) is that "[Shoemaker] shall have received *final* payment from [IOC] for [Sloan's] Work" (emphasis added).

Liberty Mutual argues that these conditions constitute a "pay-if-paid" clause. In construction contract parlance, this means that a subcontractor gets paid by the general contractor only if the owner pays the general contractor for that subcontractor's work. Pennsylvania courts follow suit, and construe clauses that condition payment to the subcontractor on the general contractor's receipt of payment from the owner as pay-if-paid clauses.[8] *See, e.g.*, *C.M. Eichenlaub Co., Inc. v. Fidelity & Deposit Co*., 437 A.2d 965, 967 (Pa. Super. Ct. 1981); *Cumberland Bridge Co. v. Lastooka*, 8 Pa. D. & C.3d 475, 482 (C.P. Washington 1977).

Sloan, on the other hand, argues that the first subparagraph of 6.f does not establish a condition precedent to Sloan's payment, but rather is a "pay-when-paid" clause. On the surface, these terms seem much the same (save, perhaps, that paying if paid does not tell us when that

---

[8] It is undisputed  that Pennsylvania law applies.

9

payment is due). But in industry jargon, they are different. In contrast to a pay-if-paid clause, a pay-when-paid clause does not establish a condition precedent, but merely creates a timing mechanism for the general contractor's payment to the subcontractor. *See, e.g.*, *United Plate Glass Co. Div. of Chromalloy Am. Corp. v. Metal Trims Indus., Inc*., 525 A.2d 468, 471 (Pa. Super. Ct. 1987).

To support its pay-when-paid interpretation, Sloan points to the second subparagraph of 6.f, which describes a process by which it may sue Shoemaker for final payment in the event that IOC fails to make final payment to Shoemaker. The language of that subparagraph states:

> Notwithstanding anything to the contrary in this Paragraph 6.f, if within six months of the date that final payment is due to [Shoemaker by IOC], [Sloan] has not received final payment for its Work, [Sloan] may pursue its claim against [Shoemaker] and its Surety [Liberty Mutual] for final payment as follows:

> If within six months of the date that final payment is due and payable to [Shoemaker], [Shoemaker] commences a legal proceedings against [IOC] . . . (the "Contractor Dispute Resolution") to resolve its own claim for final payment, [Sloan] agrees not to pursue its claim against [Shoemaker] or [Liberty Mutual] until the Contractor Dispute Resolution and all appeals thereto are completed and become final . . . .

10

> Upon completion of the Contractor Dispute Resolution . . . , [Sloan] may pursue any remaining claim for final payment it may have against [Shoemaker] or its Surety.

Notably, that subparagraph concludes by stating that

> [n]othing in Paragraph 6.f is intended to modify the provisions of Paragraph 20[, which deals with dispute resolution,] under the Subcontract . . . .

We consider each subparagraph in turn and their combined effect on the meaning of the contract.

Pennsylvania follows the plain meaning rule of contract interpretation, such that "[w]hen a written contract is clear and unequivocal, its meaning must be determined by its contents alone. It speaks for itself and a meaning cannot be given to it other than that expressed." *Steuart v. McChesney*, 444 A.2d 659, 661 (Pa. 1982) (internal quotation marks and citation omitted). Accordingly, the cases recognize that express language of condition is sufficient to establish a pay-if-paid condition precedent. In *C.M. Eichenlaub Co.*, for example, the Pennsylvania Superior Court viewed as a condition precedent to payment a clause that stated the builder "shall be under no obligation to make any payments to contractor . . . for materials delivered or for work performed by contractor unless and until Builder is first paid for such materials and work by the owner." 437 A.2d at 967; *see also Cumberland Bridge Co.*, 8 Pa. D. & C. 3d at 479-80 (same). When certainty is lacking, however, Pennsylvania

11

courts tend to interpret payment provisions as pay-when-paid clauses. *See, e.g.*, *United Plate Glass Co.*, 525 A.2d at 470.

But that is not our case. The first subparagraph of 6.f states unequivocally that IOC's payment to Shoemaker is a condition precedent to Shoemaker's obligation to pay Sloan. We do not imagine that the parties intended otherwise merely because they did not use additional language to underscore their intent to create a pay-if-paid clause, as Sloan argues. To mandate redundant provisions conjures the consequence that only repetition makes a provision pay-if-paid. Moreover, we agree that courts should not interpret contracts in a way that "render[s] at least one clause superfluous or meaningless." *Garza v. Marine Transp. Lines, Inc*., 861 F.2d 23, 27 (2d Cir. 1988). Thus, we are satisfied that the parties' chosen language is sufficient to create a pay-if-paid clause in the first subparagraph of 6.f.

The opposite conclusion would lead to bizarre results. If Sloan failed to complete its work, per condition one, could it then argue that it was still entitled to final payment under the subcontract? We can see no principled reason to treat differently conditions three and six (no payment to Sloan until Shoemaker has received "final" payment from IOC). That seven conditions were enumerated in this provision, and expressly delineated conditions precedents, weigh in favor of a pay-if-paid construction. In the face of this plain language, we shall not infer a contrary intent.[9]

---

[9] A leading construction law treatise suggests that there is nothing inherently unfair about a pay-if-paid clause that operates to shift risk of non-payment by the owner to the

12

However, that is not the end of the story. The parties created an override provision in the second subparagraph of 6.f that modifies the pay-if-paid clause of the first subparagraph. Specifically, the language of the second subparagraph, noted above, demonstrates that the contracting parties intended Sloan to have a "claim" against Shoemaker for "any remaining final payment" in certain instances— specifically, in the event that IOC failed to make final payment (defined as the entire unpaid balance on the prime contract) within six months.

A modification of a pay-if-paid condition is a not uncommon practice in the construction industry. *See The*

---

subcontractor. This interpretation is favored where there is "clear and unequivocal language set forth unambiguously on the face of the contract." For example, "the subcontractor should not be entitled to payment if a payment clause specifically states that (1) payment to the contractor is a condition precedent to payment to the subcontractor; or (2) the subcontractor is to bear the risk of the owner's insolvency; or (3) the subcontractor is to be paid exclusively out of a fund the sole source of which is the owner's payment to the subcontractor." 2-7 Construction Law P 7.04 (Matthew Bender ed., 2011). In our case, the first factor is clearly met. Arguably, the third factor is also met given that the third condition precedent in the first subparagraph of 6.f requires that "Owner [IOC] shall have accepted the Work and made final payment thereunder to Contractor [Shoemaker]." By implication, the money used to make final payment to the subcontractor comes directly from the final payment made to the contractor.

*Construction Contracts Book* 160-63 (Daniel S. Brennan et al. eds., 2d ed. 2008). There are several ways to modify pay-if-paid clauses. Particularly "[i]n states that distinguish between the two [*i.e.*, pay-if-paid and pay-when-paid provisions], an obvious way to modify a pay-if-paid clause is to convert it to a pay-when-paid clause. This is accomplished by eliminating the condition precedent after a contractually stated period of time." *Id.* at 162. Though we do not know for certain, we can imagine several reasons why the parties here—both sophisticated players—might have contracted for such a modification. For one, "pragmatic contractor[s]" understand subcontractors' reluctance to agree to an absolute pay-if-paid clause and are thus sometimes amenable to some form of modification or 'softening' of the condition precedent. *See id.* at 160. Alternatively, Shoemaker may have anticipated that Sloan would sue for payment if IOC defaulted, notwithstanding the pay-if-paid clause. The second part of Paragraph 6.f is a way to control the timing and extent of Sloan's legal action in that scenario.

In any event, the pay-if-paid condition, as modified, yields after six months of IOC non-payment and is replaced with a timing mechanism that specifies when and for how much Sloan may sue Shoemaker. Specifically, that timing mechanism allows Sloan to "pursue any remaining claim for final payment." It requires Sloan to wait to "pursue" its "claim" until Shoemaker has had an opportunity to recover what it can from IOC. Accordingly, because IOC has failed to pay for over six months and Shoemaker's suit against IOC for payment has concluded, Sloan is entitled to "pursue any remaining claim for final payment."

14

That conclusion leads to another issue: how to define "any remaining claim for final payment." The structure of Paragraph 6.f demonstrates that the parties did not intend for Sloan's "remaining claim for final payment" to equal the entire unpaid balance on the subcontract. Such a construction would essentially nullify the first subparagraph: whether IOC made, and Shoemaker received, final payment on the prime contract would be irrelevant if, in cases of IOC non-payment, Sloan was always entitled to the entire unpaid balance on the subcontract.

To understand what the parties intended by the phrase "remaining claim for final payment," we must read Paragraph 6.f in connection with Paragraph 20, for, as noted, the former is subject to the latter. Paragraph 20's provisions on "dispute resolution" reads in relevant part:

> In the event [Sloan] asserts a claim for payment of the Subcontract Sum or a portion thereof . . . and in the event that [Shoemaker] in its sole, exclusive and arbitrary discretion submits said . . . Claim to [IOC] . . . for a decision or determination, then all decisions and determinations made by [IOC] or its representative shall be binding upon [Sloan] even though [Sloan] may not be a party thereto . . . .

> The decision or determination of [IOC] or its representative making the first and/or original decision shall be final and conclusive on [Sloan] except to the extent that [Shoemaker] may in its sole, exclusive and arbitrary

15

> discretion . . . appeal to other representatives of [IOC] or commence a proceeding in Court or arbitration or other dispute resolution forum . . . .
>
> Then, in such event, [Sloan] agrees to be bound to [Shoemaker] to the same extent [Shoemaker] is bound to [IOC] by any final decisions of said other representative of [IOC] or of a Court of competent jurisdiction or by any final or interim award issued in arbitration or by any final decisions issued in any other dispute resolution forum . . . .

This provision, also common in construction contracts, provides a procedural mechanism for pass-through claims—a process by which a general contractor may assert the claims of its subcontractors against an owner. This mechanism is known as a "liquidating agreement."[10] *See E. Elec. Corp. v.*

---

[10] "Liquidating agreements" in construction contracts are not the same as "liquidated" in the liquidated damages sense (the latter converting damages for a legal injury to a sum certain in cash, *see A.G. Cullen Const., Inc. v. State Sys. of Higher Educ.*, 898 A.2d 1145, 1161-62 (Pa. Commw. Ct. 2006) (noting that liquidated damages "denotes the sum a party to a contract agrees to pay if he breaks some [contractual] promise")). Liquidating agreements are the mechanism by which pass-through claims are asserted and they can, depending on how they are drafted, "liquidate" damages (so to speak) to the amount that the contractor has recovered from the owner. They range in complexity and detail, depending on the drafting. In any event, we do not suggest that a

16

*Shoemaker Const. Co.*, 657 F. Supp. 2d 545, 560 (E.D. Pa. 2009) (acknowledging as a liquidating agreement language that mirrors that in our case, namely, that the "Subcontractor agrees to be bound to the Contractor to the same extent the Contractor is bound to the Owner by any final decisions of [Owner's representative] or of a Court of competent jurisdiction . . .[,] whether or not Subcontractor is a party to such proceedings" (alterations in original)). One reason for including this mechanism in subcontracts is to give the subcontractor some means of redress against the owner in situations where it would otherwise have none because it lacks privity of contract with the owner. Thomas J. Kelleher, Jr., Brian G. Corgan & William E. Dorris, *Construction Disputes: Practice Guide with Forms* 904 (2d ed. 2002).

Sloan argues that Paragraph 20 does not apply to this case because its only purpose is to resolve disputes between the subcontractor and the general contractor over whether a particular payment is owed and was not intended to resolve disputes over final payment. We disagree.

Sloan's narrow interpretation of Paragraph 20 is unlikely. It seems strange that Sloan would have negotiated for a liquidating provision that is limited in the way it suggests, as it would be of little worth to Sloan: without the ability to press a claim for final payment through Shoemaker against IOC, Sloan would have no other remedy against IOC in situations of IOC's default. Moreover, the language of Paragraph 6.f belies Sloan's limited interpretation of

liquidating agreement is the same thing as a liquidated damages provision.

17

Paragraph 20. The former provision is explicit that if Shoemaker pursues "its own claim for final payment," that claim "may or may not include claims of the Subcontractor."

Shoemaker, Sloan argues, was not pursuing any of its (Sloan's) claims in any event. We do not accept that Shoemaker was asserting its own claims wholly independent of Sloan's. As a practical matter, there is no meaningful distinction between a suit brought to pay Shoemaker's invoices (which include those of its subcontractors) and a suit brought nominally as a claim for its subcontractors' payments. In any event, Shoemaker made a claim of $6.5 million against IOC, $5 million of which was for the exclusive benefit of its subcontractors. It intends to pass all funds received from the settlement through to its subcontractors on a proportional basis. In these circumstances, that Shoemaker did not specifically name Sloan in Shoemaker's complaint against IOC is of no consequence. We conclude that Paragraph 20 applies in this case, and now turn to how this affects the nature and extent of Sloan's "remaining claim for final payment."

Liquidating agreements that enable pass-through claims, such as the one in the contract before us, can also serve to limit the subcontractor's damages to the amount the contractor recovers from the owner. *See* Carl A. Calvert & Carl F. Ingwalson, Jr., *Pass Through Claims and Liquidation Agreements*, Constr. Lawyer, Oct. 1998, at 32, 33. Here, the subcontract stated that "all decisions and determinations made by [IOC]" in connection with a passed-through claim would be "binding upon [Sloan] even though [Sloan] may not be a party thereto."

18

This language in Paragraph 20 is repeated in the second subparagraph of 6.f, the very provision that establishes that Sloan has a "claim" in the event of IOC non-payment. There, the parties agreed that nothing in that Paragraph modifies Paragraph 20, "including[,] without limitation, the provisions by which [Sloan] shall be bound to the decision and/or determination of [IOC], its representatives or a court or other fact finding dispute resolution forum[,] concerning the claims of [Sloan]." In contract-speak, this is a "super-override." As Sloan is a sophisticated contracting party, we cannot believe it did not understand the import of this language that it agreed to twice. We thus conclude that Paragraphs 20 and 6.f create a mechanism for passing through Sloan's remaining claims for final payment and peg Sloan's recovery to the amount that Shoemaker receives from IOC for Sloan's work.

We believe that this outcome is consistent with the way in which the parties chose to allocate the risk of IOC non-payment. As a general matter, industry custom places the risk of an owner's insolvency on the general contractor. *See, e.g.*, *Thos. J. Dyer Co. v. Bishop Int'l Eng'g Co.*, 303 F.2d 655, 660-61 (6th Cir. 1962). But it is also industry custom that "various legal and contractual provisions . . . are used to reduce this [risk] to a minimum," and that "express condition[s] clearly showing that to be the intention of the parties" may "transfer this normal credit risk incurred by the general contractor from the general contractor to the subcontractor." *Id.* at 660-61. A way to do this is to put in the contract a pay-if-paid provision, as it is "meant to shift the risk of the owner's nonpayment under the subcontract from the contractor to the subcontractor." *Fixture Specialists, Inc. v. Global Const., LLC*, No. 07-5614, 2009 WL 904031, at *4

19

(D.N.J. Mar. 30, 2009) (quoting *MidAm. Const. Mgmt. Co. v. Mastec N. Am., Inc.*, 436 F.3d 1257 (10th Cir. 2006)). Such risk-shifting devices are easy to understand: "[f]ew contractors can financially absorb a major default in payment by an owner in connection with a large construction project. In the absence of an enforceable pay-if-paid clause, if the owner defaults, the likely result would be an insolvent or bankrupt contractor." *Construction Contracts Book*, *supra*, at 158.

In this case, however, we believe the parties intended, per the second part of Paragraph 6.f, to share the risk of IOC's non-payment. Shoemaker will bear its share of the loss by distributing all of the settlement proceeds *pro rata* to its subcontractors and keeping nothing for itself. But under the District Court's analysis, Shoemaker would bear all of the loss and Sloan none. It would also force the other subcontractors to shoulder a disproportionate amount of loss: if Shoemaker is forced to pay Sloan the full balance, the others might get nothing and certainly less than their *pro rata* share. We do not believe Shoemaker and Sloan intended such an outcome when they drafted the subcontract and we shall not redistribute risk and loss in such a counterintuitive way absent clear language to that effect. As such, Sloan must bear its share of IOC's failure to pay by accepting only a *pro rata* share of the recovery by Shoemaker rather than the full balance on its subcontract.[11]

---

[11] Sloan complains that the situation is contrary to Pennsylvania's public policy because, to procure the subcontract, it was required to waive its mechanic's lien (which is a legal interest in the property held by those who

In addition, we do not favor an interpretation that discourages contractors from vigorously pursuing owners for sums due to subcontractors. Shoemaker purportedly spent over $3 million in order to get back a $1 million settlement, of which we understand only $300,000 has been paid. It has stated that it will pass through all sums recovered subject to the parties sharing *pro rata* in all expenses and costs. Were we to interpret the subcontract to give Sloan the entire balance on the subcontract, contractors in the future would be very reluctant to expend such substantial costs for the exclusive benefit of their subcontractors.

Finally, our interpretation is consistent with the industry custom and usage surrounding liquidating agreements, which is to "provide a means to simplify the pursuit of pass through claims while preserving working relationships and reducing costs," and the industry's understanding that "the major reason for negotiating liquidation agreements is to bring the claim against the

---

provide unpaid labor or materials to build or improve the property, *see Halowich v. Amminiti*, 154 A.2d 406, 407 (Pa. Super. Ct. 1959)), and was given the surety bond instead. It cites to state law that conditions the validity of a mechanic's lien waiver on posting a surety bond. 49 Pa. Cons. Stat. Ann. § 1401(a)(2)(ii) (West 2007). However, this amendment to Pennsylvania law came into effect after Sloan bid for and accepted the subcontract. Without relying on that policy, Sloan freely accepted the tradeoff between a mechanic's lien and a surety bond. In this context, we do not believe that enforcing the contract as written and intended by the parties is contrary to public policy.

responsible party"—here the owner, IOC. Calvert & Ingwalson, *supra*, at 37.

As Shoemaker's suit against IOC qualified as a "pass-through" claim of all its subcontractors, and IOC's decision to settle was a qualifying "determination" by it (the outcome of which now binds Sloan), Sloan's claim against Shoemaker is limited to its *pro rata* share of the settlement proceeds.[12]

## B. Legal fees

Liberty Mutual also argues that it was entitled to deduct (or offset) from Sloan's recovery the latter's share of Shoemaker's attorneys' fees, costs, and expenses incurred in the suit against IOC. Before we deal with the merits of this issue, we note that Sloan cross-appeals the District Court's decision to allow Liberty Mutual's offset claims to proceed, arguing they were not raised within 45 days of Sloan's initial claim. Thus we deal with the cross-appeal at the outset.

The bond required that Liberty Mutual raise all disputes with Sloan's claim within 45 days. As noted, Liberty Mutual generally denied Sloan's entire claim within 35 days, but rather than explaining the various offsets it planned to claim, it simply reserved its rights and defenses. Sloan argued to the District Court that Liberty Mutual was

---

[12] Because we decide on the basis of the parties' express agreement that Sloan is entitled only to its *pro rata* share of the settlement amount, we need not determine whether the Pennsylvania Contractor and Subcontractor Payment Act, 73 Pa. Stat. Ann. § 507 (West 2006), provides an additional basis for imposing a pay-if-paid condition on the subcontract.

required to state the exact amount it disputed, including the offsets for "time and materials provided," "lump sum proposals performed," and legal fees. The District Court rejected that argument and held that Liberty Mutual's response met its obligations under Paragraph 6.1 of the bond.[13] We agree.

Sloan relies on three cases to support its waiver argument. The first is *National Union Fire Insurance Co. v. Bramble, Inc.*, 879 A.2d 101 (Md. 2005). But there the surety did not refute the subcontractor's claim at all; it merely acknowledged receipt of the subcontractor's letter and requested proof of the claim. The other two cases relate tenuously at best, as neither is precedential. *See J.C. Gibson Plastering Co. v. XL Specialty Ins. Co.*, 521 F. Supp. 2d 1326 (M.D. Fla. 2007) (vacated with instructions that it shall not be cited or serve as precedent and modified to make exception for facts not reasonably available in the 45-day period); *Casey Indus., Inc. v. Seaboard Surety Co.*, No. 1:06cv249, 2006 WL 3299932 (E.D. Va. Oct. 25, 2006) (unpublished decision holding that the surety was precluded from developing new bases for dispute outside the 45-day period).

In any event, it is clear to us that Sloan's argument runs contrary to standard industry practice. The Surety & Fidelity Association of America explains in its *amicus* brief that in recent revisions of the standard payment bond form,

---

[13] Paragraph 6.1 required Liberty Mutual to answer Sloan within 45 days of its receipt of Sloan's claim, stating, *inter alia*, the bases for challenging any disputed amounts of that claim.

the industry chose language to clarify that Paragraph 6 does not put sureties at risk of waiving claims to specific offsets. Brief for Surety & Fidelity Assoc. of Am. as *Amicus Curiae* Supporting Appellants, Liberty Mutual Ins. Co., Nos. 10-1725 & 10-1765, at 15-17. The revised form clarifies that a surety's failure to discharge obligations under Paragraphs 6.1 or 6.2 "shall not be deemed to constitute a waiver of defenses."

Once again, the consequences of Sloan's interpretation are untenable. Its construction would essentially require a surety to state every reason or contention it has or may later have in connection with a general denial of the claim lest it be precluded from asserting those defenses in the future.[14] We believe that Liberty Mutual's response to Sloan met the requirements of the bond as those requirements were understood in the industry at the time of Liberty Mutual's response, and we thus conclude that it did not breach the surety bond contract.

Turning now to the merits, Paragraph 20 of the subcontract states that "[i]f [Sloan]'s claims are prosecuted or defended by [Shoemaker] against [IOC] or others, then [Sloan] agrees . . . to pay or reimburse [Shoemaker] for all expenses and costs, if any, incurred in connection therewith." As discussed, we believe Paragraph 20 applies to this case and Shoemaker asserted a pass-through claim on behalf of

---

[14] Moreover, the bond required only a barebones demand for payment of a sum certain without any backup documentation. It makes little sense, then, to require the surety to reply with a detailed and exhaustive accounting.

24

Sloan. Thus, the only remaining question is whether the term "expenses and costs" includes attorneys' fees in addition to other litigation-related expenses and costs. We believe that it does.

Sloan contends that if the parties had intended to provide for attorneys' fees in Paragraph 20, they would have stated so explicitly. Indeed, the "settled" law of Pennsylvania is that "attorneys['] fees are recoverable from an adverse party to a cause only when provided for by statute, or when clearly agreed to by the parties." *Fidelity-Phila. Trust Co. v. Phila. Transp. Co.*, 173 A.2d 109, 113 (Pa. 1961). The latter is our case; the parties were sufficiently explicit that attorneys' fees and litigation costs were within the purview of the contract. The most natural and likely meaning of "expenses and costs" in a paragraph discussing procedural mechanisms for lawsuits and other dispute resolution proceedings is that the term includes attorneys' fees and not simply court and mediation costs. *See Wrenfield Homeowners Ass'n v. DeYoung*, 600 A.2d 960 (Pa. 1991) (interpreting contractual agreement to pay the "costs of collecti[ng]" home-owner association assessments as including attorneys' fees, given the broadness of that phrase and the reasonableness of that interpretation in context); *Burrage v. Cnty. of Bristol*, 210 Mass. 299, 300 (1911) (noting the "word 'expenses' [is] broad enough to include counsel fees" and whether it does depends on the context).[15]

---

[15] Our holding is limited to Liberty Mutual's right to expenses and costs (including attorneys' fees) from Shoemaker's case against IOC. Because Liberty Mutual's claim for attorneys' fees was dismissed at summary judgment, without discovery

25

\* \* \* \* \*

For the reasons discussed above, we reverse the District Court's Final Judgment to the extent that it granted summary judgment to Sloan on (1) its interpretation of the subcontract and (2) Liberty Mutual's claim for the proportional offset against Sloan of legal fees Shoemaker incurred in its suit again IOC; we affirm the Court's denial of Sloan's waiver claim (the subject of Sloan's cross-appeal in this case); and remand for further proceedings consistent with this opinion. Though the parties do not contest the stipulated amounts of the offsets in the Final Judgment, we leave to the District Court whether on remand they may argue those other offsets.

---

regarding the amounts and reasonableness of those fees, we leave it to Liberty Mutual to prove that on remand. However, because we limit Sloan's claim to its *pro rata* share of the amount recovered so far, $300,000, we believe it reasonable for Liberty Mutual to offset Sloan's claim, at most, by the appropriate *pro rata* share of that $300,000.