[992 NE2d 1076, 970 NYS2d 733]

J.P. Morgan Securities Inc. et al., Appellants, v Vigilant Insurance Company et al., Respondents.

Argued May 1, 2013; decided June 11, 2013

### POINTS OF COUNSEL

*Proskauer Rose LLP*, New York City (*John H. Gross, Steven E. Obus, Seth B. Schafler, Francis D. Landrey* and *Matthew J. Morris* of counsel), for appellants. I. Bear Stearns Companies LLC incurred a covered loss, and neither received ill-gotten gains nor was unjustly enriched. (*MBIA Inc. v Federal Ins. Co.*, 652 F3d 152; *Vigilant Ins. Co. v Credit Suisse First Boston Corp.*, 6 Misc 3d 1020[A], 2003 NY Slip Op 51747[U], 10 AD3d 528; *Level 3 Communications, Inc. v Federal Ins. Co.*, 272 F3d 908; *Genzyme Corp. v Federal Ins. Co.*, 622 F3d 62; *Unified W. Grocers, Inc. v Twin City Fire Ins. Co.*, 457 F3d 1106; *Ryerson Inc. v Federal Ins. Co.*, 676 F3d 610; *Pan Pac. Retail Props., Inc. v Gulf Ins. Co.*, 471 F3d 961; *CNL Hotels & Resorts, Inc. v Houston Cas. Co.*, 505 F Supp 2d 1317; *Vigilant Ins. Co. v Bear Stearns Cos., Inc.*, 34 AD3d 300, 10 NY3d 170; *Millennium Partners, L.P. v Select Ins. Co.*, 24 Misc 3d 212, 68 AD3d 420.) II. The Appellate Division contravened New York public policy when it held that coverage for Bear Stearns Companies LLC's loss should be nullified, whether or not the loss constituted the return of Bear Stearns' own ill-gotten gain, to preserve the deterrent effect of the Securities and Exchange Commission's disgorgement action. (*Miller v Continental Ins. Co.*, 40 NY2d 675;

*Public Serv. Mut. Ins. Co. v Goldfarb*, 53 NY2d 392; *Messer-smith v American Fid. Co.*, 232 NY 161; *New England Mut. Life Ins. Co. v Caruso*, 73 NY2d 74; *Oppenheimer & Co. v Oppenheim, Appel, Dixon & Co.*, 86 NY2d 685; *Morris v Snappy Car Rental*, 84 NY2d 21; *Charlebois v Weller Assoc.*, 72 NY2d 587; *Slayko v Security Mut. Ins. Co.*, 98 NY2d 289; *Joseph R. Loring & Assoc. v Continental Cas. Co.*, 56 NY2d 848; *Hartford Acc. & Indem. Co. v Village of Hempstead*, 48 NY2d 218.) III. The Appellate Division erroneously assumed that Bear Stearns Companies LLC engaged in wrongful conduct warranting the nullification of its insurance coverage. (*511 W. 232nd Owners Corp. v Jennifer Realty Co.*, 98 NY2d 144; *Servidone Constr. Corp. v Security Ins. Co. of Hartford*, 64 NY2d 419; *Pendergest-Holt v Certain Underwriters at Lloyd's of London*, 600 F3d 562; *Little v MGIC Indem. Corp.*, 836 F2d 789; *Lipsky v Commonwealth United Corp.*, 551 F2d 887; *In re Platinum & Palladium Commodities Litig.*, 828 F Supp 2d 588; *Matter of Halyalkar v Board of Regents of State of N.Y.*, 72 NY2d 261; *Raychem Corp. v Federal Ins. Co.*, 853 F Supp 1170; *Cambridge Fund, Inc. v Abella*, 501 F Supp 598; *National Union Fire Ins. Co. of Pittsburgh, Pa. v Xerox Corp.*, 25 AD3d 309.)

*DLA Piper LLP (US)*, New York City (*Joseph G. Finnerty III, Megan Shea Harwick, Eric S. Connuck* and *Miles D. Norton* of counsel), *Kaufman Borgeest & Ryan LLP* (*Scott A. Schechter* and *Sergio Alves* of counsel), *D'Amato & Lynch, LLP* (*Luke D. Lynch, Jr., Richard F. Russell* and *Liza A. Chafiian* of counsel), *Drinker Biddle & Reath LLP* (*Marsha J. Indych, Douglas M. Mangel* and *David F. Abernethy* of counsel), *Clyde & Co. US LLP* (*Edward J. Kirk* and *Allison M. Calkins* of counsel), *Landman Corsi Ballaine & Ford P.C.* (*Michael L. Gioia* of counsel) and *Bates Carey Nicolaides LLP*, Chicago, Illinois (*Ommid C. Farashahi, Kristi S. Nolley* and *R. Patrick Bedell* of counsel), for respondents. I. The First Department correctly held that Bear Stearns' disgorgement payment is not an insurable loss as a matter of New York law and public policy. (*Securities & Exch. Commn. v First Jersey Sec., Inc.*, 101 F3d 1450; *United States Sec. & Exch. Commn. v Svoboda*, 409 F Supp 2d 331; *United States Sec. & Exch. Commn. v Universal Express, Inc.*, 646 F Supp 2d 552; *212 Inv. Corp. v Kaplan*, 16 Misc 3d 1125[A], 2007 NY Slip Op 51577[U]; *Securities & Exch. Commn. v First City Fin. Corp., Ltd.*, 890 F2d 1215; *Securities & Exch. Commn. v Warde*, 151 F3d 42; *Securities & Exch. Commn. v Patel*, 61 F3d 137; *Federal Trade Commn. v Bronson Partners, LLC*, 654 F3d 359; *Securities & Exch. Commn. v Fischbach Corp.*, 133 F3d

170; *Securities & Exch. Commn. v DiBella*, 587 F3d 553.) II. Bear Stearns is bound by the consented-to and stipulated findings in the Securities and Exchange Commission order and New York Stock Exchange decision. (*Ark Bryant Park Corp. v Bryant Park Restoration Corp.*, 285 AD2d 143; *Wilhelmina Models, Inc. v Fleisher*, 19 AD3d 267; *Biondi v Beekman Hill House Apt. Corp.*, 257 AD2d 76, 94 NY2d 659; *International Telephone & Telegraph Corp. v Electrical Workers*, 419 US 428; *Levy v United States Sec. & Exch. Commn.*, 462 F Supp 2d 64; *Millennium Partners, L.P. v Select Ins. Co.*, 24 Misc 3d 212, 68 AD3d 420; *Servidone Constr. Corp. v Security Ins. Co. of Hartford*, 64 NY2d 419; *Bankwest v Fidelity & Deposit Co. of Md.*, 63 F3d 974; *Travelers Ins. Co. v Waltham Indus. Labs. Corp.*, 883 F2d 1092; *Northland Cas. Co. v HBE Corp.*, 160 F Supp 2d 1348.) III. The Securities and Exchange Commission findings set forth Bear Stearns' inherently harmful and fraudulent conduct. (*Town of Massena v Healthcare Underwriters Mut. Ins. Co.*, 98 NY2d 435; *Austro v Niagara Mohawk Power Corp.*, 66 NY2d 674; *Hertz Corp. v Government Empls. Ins. Co.*, 250 AD2d 181; *Public Serv. Mut. Ins. Co. v Goldfarb*, 53 NY2d 392; *Messersmith v American Fid. Co.*, 232 NY 161; *Dodge v Legion Ins. Co.*, 102 F Supp 2d 144; *Allstate Ins. Co. v Mugavero*, 79 NY2d 153; *Accessories Biz, Inc. v Linda & Jay Keane, Inc.*, 533 F Supp 2d 381; *DeSantis Enters. v American & Foreign Ins. Co.*, 241 AD2d 859; *Syvertsen v Great Am. Ins. Co.*, 267 AD2d 854.) IV. The policies exclude coverage for claims based upon or arising out of any improper profit or advantage obtained by Bear Stearns. (*United States Fid. & Guar. Co. v Annunziata*, 67 NY2d 229; *Bassuk Bros. v Utica First Ins. Co.*, 1 AD3d 470; *Jahier v Liberty Mut. Group*, 64 AD3d 683; *Jarvis Christian Coll. v National Union Fire Ins. Co. of Pittsburgh, PA.*, 197 F3d 742; *TIG Specialty Ins. Co. v Pinkmonkey.com Inc.*, 375 F3d 365; *National Union Fire Ins. Co. of Pittsburgh, Pa. v Continental Ill. Corp.*, 666 F Supp 1180; *Steadfast Ins. Co. v Stroock & Stroock & Lavan LLP*, 277 F Supp 2d 245; *Penna v Peerless Ins. Co.*, 510 F Supp 2d 199; *Excess Ins. Co. Ltd. v Factory Mut. Ins. Co.*, 3 NY3d 577; *Maroney v New York Cent. Mut. Fire Ins. Co.*, 5 NY3d 467.) V. The insurers did not agree to indemnify Bear Stearns for the disgorgement of ill-gotten gains created by its willful collaboration in an illegal mutual fund trading scheme. (*Public Serv. Mut. Ins. Co. v Goldfarb*, 53 NY2d 392; *Messersmith v American Fid. Co.*, 232 NY 161; *Official Comm. of Unsecured Creditors of WorldCom, Inc. v Securities & Exch. Commn.*, 467 F3d 73; *Securities & Exch. Commn. v Cavanagh*, 445 F3d 105; *Securities*

& *Exch. Commn. v Tome*, 833 F2d 1086; *Securities & Exch. Commn. v Commonwealth Chem. Sec., Inc.*, 574 F2d 90; *Securities & Exch. Commn. v Drexel Burnham Lambert, Inc.*, 956 F Supp 503; *Ryerson, Inc. v Federal Ins. Co.*, 796 F Supp 2d 911; *Continental Cas. Co. v Pittsburgh Corning Corp.*, 917 F2d 297; *Raymond Corp. v National Union Fire Ins. Co. of Pittsburgh, Pa.*, 5 NY3d 157.) VI. The prior wrongful acts exclusion applies to bar coverage under underwriters' excess policies. (*Matter of Garner v New York State Dept. of Correctional Servs.*, 10 NY3d 358; *McKee v City of Cohoes Bd. of Educ.*, 99 AD2d 923; *Matter of Miller v Captain Brereton*, 98 AD3d 824; *Clayton B. Obersheimer, Inc. v Travelers Cas. & Sur. Co. of Am.*, 96 AD3d 1284; *Matter of Tristram K.*, 65 AD3d 894; *Securities & Exch. Commn. v Durgarian*, 477 F Supp 2d 342; *Securities & Exch. Commn. v Pimco Advisors Fund Mgt., LLC*, 341 F Supp 2d 454; *Executive Risk Indem. Inc. v Pepper Hamilton LLP*, 13 NY3d 313; *CPA Mut. Ins. Co. of Am. Risk Retention Group v Weiss & Co.*, 80 AD3d 431.) VII. Defense costs are uninsurable where, as here, no coverage is triggered by the claim. (*Vigilant Ins. Co. v Credit Suisse First Boston Corp.*, 10 AD3d 528; *Millennium Partners, L.P. v Select Ins. Co.*, 24 Misc 3d 212, 68 AD3d 420; *Stonewall Ins. Co. v Asbestos Claims Mgt. Corp.*, 73 F3d 1178.)

*Melito & Adolfsen PC*, New York City (*S. Dwight Stephens* of counsel), and *Wiley Rein LLP*, Washington, D.C. (*Daniel J. Standish* and *Cara Tseng Duffield* of counsel), for American Insurance Association, amicus curiae. I. The public policy prohibition against insuring disgorgement payments is critical to the sound functioning of the insurance market. (*Securities & Exch. Commn. v Fischbach Corp.*, 133 F3d 170; *Securities & Exch. Commn. v Drexel Burnham Lambert, Inc.*, 956 F Supp 503; *Reliance Group Holdings v National Union Fire Ins. Co. of Pittsburgh, Pa.*, 188 AD2d 47; *Vigilant Ins. Co. v Credit Suisse First Boston Corp.*, 10 AD3d 528; *Millennium Partners, L.P. v Select Ins. Co.*, 68 AD3d 420; *Soto v State Farm Ins. Co.*, 83 NY2d 718; *Home Ins. Co. v American Home Prods. Corp.*, 75 NY2d 196; *Public Serv. Mut. Ins. Co. v Goldfarb*, 53 NY2d 392; *Hartford Acc. & Indem. Co. v Village of Hempstead*, 48 NY2d 218; *Allstate Ins. Co. v Mugavero*, 79 NY2d 153.) II. Allowing insureds to recast the terms of regulatory settlements would alter the nature of the insured risk and obstruct the claims handling process. (*Vigilant Ins. Co. v Bear Stearns Cos., Inc.*, 34 AD3d 300; *Vigilant Ins. Co. v Credit Suisse First Boston Corp.*, 10 AD3d 528; *Millennium Partners, L.P. v Select Ins. Co.*, 68 AD3d 420; *Level 3 Communications, Inc. v Federal Ins. Co.*, 272 F3d 908; *Ryerson Inc. v Federal Ins. Co.*, 676 F3d 610.)

GRAFFEO, J.

In this insurance dispute arising from the insured's monetary settlement of a Securities and Exchange Commission (SEC) proceeding and related private litigation predicated on the insured's violations of federal securities laws, we conclude that the insurers are not entitled to a CPLR 3211 dismissal of the insured's coverage claims. We therefore reverse and reinstate the insured's complaint.

In 2003, the SEC and other regulatory entities undertook an investigation of Bear Stearns & Co., Inc., a broker-dealer, and Bear Stearns Securities Corp., a clearing firm, for allegedly facilitating late trading and deceptive market timing on behalf of certain customers (predominately large hedge funds) for the purchase and sale of shares in mutual funds.[1] During the course of the investigation, the SEC notified Bear Stearns of its intention to commence a civil proceeding charging Bear Stearns with violations of federal securities laws and seeking injunctive relief and sanctions of $720 million. Bear Stearns disputed the proposed charges in a "Wells Submission" in which it claimed that, as a clearing broker that processed transactions initiated by others, it did not knowingly violate any law; its management did not facilitate the late trading or market timing; and it did not share in the profits or benefits from the late trading, from which it received only $16.9 million in commissions.

Nevertheless, Bear Stearns made a formal offer of settlement in November 2005. The SEC accepted the offer and in March 2006 it issued an "Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings, and Imposing Remedial Sanctions" (the SEC order). "Solely for the purpose of these proceedings" and "without admitting or denying the findings," Bear Stearns agreed to pay $160 million as "disgorgement"

---

1. Late trading is the practice of placing orders to buy, redeem or exchange mutual fund shares after the 4:00 p.m. close of trading, but receiving the price based on the net asset value set at the close of trading. The practice allows traders to obtain improper profits by using information obtained after the close of trading. Market timing involves the frequent buying and selling of shares of the same mutual fund or the buying or selling of mutual fund shares to exploit inefficiencies in mutual fund pricing. Although market timing is not per se improper, it can be deceptive if it induces a mutual fund to accept trades it otherwise would not accept under its own market timing policies.

and $90 million as a civil penalty.[2] The agreed-upon $250 million payment was deposited in a fund to compensate any mutual fund investors who had been harmed by Bear Stearns' conduct. The SEC order provided that, "[t]o preserve the deterrent effect of the civil penalty," Bear Stearns agreed that it would not benefit from an offset in any related private litigation for sums distributed to those private litigants that were attributable to the $90 million penalty. The SEC order did not contain a similar restriction regarding the right to offset the $160 million disgorgement payment.

The SEC order also set forth detailed findings stating that, between 1999 and 2003, Bear Stearns "facilitated a substantial amount of late trading and deceptive market timing"; "knowingly or recklessly processed thousands of late trades"; "took no steps to alter [its] procedures or to implement effective measures to stop deceptive timing"; "took affirmative steps to hide from mutual funds the identity of customers that were known market timers by, for example, assigning multiple account numbers to customers"; and "knew or [was] reckless in not knowing" that its brokers' use of multiple account numbers for certain customers "would be used for market timing." Based on its role in supporting the late trading and market timing activities of its customers, the SEC found that Bear Stearns "willfully" violated section 17 (a) of the Securities Act of 1933 (*see* 15 USC § 77q [a]); sections 10 (b) and 15 (c) of the Securities Exchange Act of 1934 (*see* 15 USC §§ 78j [b]; 78o [c]); and SEC Rules 10b-5 and 22c-1 (a) (*see* 17 CFR 240.10b-5, 270.22c-1 [a]).

Meanwhile, during the pendency of the SEC matter, Bear Stearns was named as a defendant in a number of private class action lawsuits brought by various mutual funds based on similar late trading and market timing allegations. Following the SEC settlement and the establishment of the $250 million fund, Bear Stearns settled the private actions for $14 million. According to Bear Stearns, it incurred $40 million in defense costs attributable to defending both the SEC proceeding and the private litigation.

Bear Stearns then sought indemnification from its insurers—defendants Vigilant Insurance Company, its primary carrier,

---

**2.** Defendants in SEC enforcement proceedings commonly consent to sanctions without admitting or denying guilt (*see* 6 Hazen, Treatise on the Law of Securities Regulation § 16.2 [1] [B] at 171 [6th ed 2009]).

and six excess carriers (collectively, the Insurers).[3] It requested indemnity for three claims: the $160 million SEC disgorgement payment (less a $10 million self-insured retention); $40 million in defense costs; and the $14 million private settlement. Bear Stearns did not seek coverage for the $90 million SEC penalty.

The primary professional liability policy, to which the excess policies follow form, provides that the Insurers are to "pay on behalf of [Bear Stearns] all Loss which [Bear Stearns] shall become legally obligated to pay as a result of any Claim . . . for any Wrongful Act of [Bear Stearns]." "Loss" is defined as:

> "(1) compensatory damages, multiplied damages, punitive damages where insurable by law, judgments, settlements, costs, charges and expenses or other sums [Bear Stearns] shall legally become obligated to pay as damages resulting from any Claim or Claim(s);

> "(2) costs, charges and expenses or other damages incurred in connection with any investigation by any governmental body or self-regulatory organization (SRO), provided however, Loss shall not include:

> "(i) fines or penalties imposed by law; or . . .

> "(v) matters which are uninsurable under the law pursuant to which this policy shall be construed."

The term "Wrongful Act" under the policy means "any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by [Bear Stearns]." A "Claim" includes both private civil actions as well as investigations and proceedings initiated by governmental bodies or SROs. The Insurers had no separate duty to defend; rather, defense costs expended by Bear Stearns could be recouped if they fell within the definition of Loss. Finally, although the policy contains an exclusion for "deliberate, dishonest, fraudulent or criminal" acts or omissions, it provides that Bear Stearns would remain "protected under the terms of this policy" unless and until a "judgment or other final adjudication" established that Bear Stearns committed such acts or omissions.

After the Insurers denied coverage for all three claims, plaintiffs J.P. Morgan Securities Inc., J.P. Morgan Clearing Corp.

---

**3.** The excess carriers are The Travelers Indemnity Company, Federal Insurance Company, National Union Fire Insurance Company of Pittsburgh, Pa., Liberty Mutual Insurance Company, Certain Underwriters at Lloyd's, London, and American Alternative Insurance Corporation.

and The Bear Stearns Companies LLC (collectively, Bear Stearns)[4] commenced this breach of contract and declaratory judgment action against the Insurers. Bear Stearns asserted that its claims all fell within the definition of Loss and alleged that a substantial portion of the SEC disgorgement payment ($140 million) represented illicit profits obtained by its hedge fund customers rather than gains enjoyed by Bear Stearns itself. The Insurers moved to dismiss the complaint pursuant to CPLR 3211 (a) (1) and (7) arguing, among other things, that Bear Stearns could not be indemnified for any portion of the SEC disgorgement payment as a matter of public policy.

Supreme Court denied the Insurers' dismissal motions, holding that it was unable to conclude, on the basis of the SEC order alone, that the $160 million disgorgement payment was "specifically linked" to Bear Stearns' improperly acquired funds, as opposed to profits that flowed to its customers (2010 NY Slip Op 33799[U], *10 [2010]). The Appellate Division reversed and dismissed the complaint in its entirety, holding that, as a matter of public policy, Bear Stearns could not seek recoupment of the $160 million disgorgement payment (91 AD3d 226 [1st Dept 2011]).[5] We granted Bear Stearns leave to appeal (19 NY3d 806 [2012]).

Bear Stearns submits that the Appellate Division erred in concluding, as a matter of law, that it could not pursue coverage under its policies for any of the $160 million SEC disgorgement payment. It acknowledges that it is reasonable to preclude an insured from obtaining indemnity for the disgorgement of its own ill-gotten gains, but contends that it was not unjustly enriched by at least $140 million of the disgorgement payment because that portion was attributable to the profits of its customers. In response, the Insurers do not earnestly dispute that the claims fall within the policy's definition of Loss. Rather, they posit that the Appellate Division correctly concluded, for public policy reasons, that Bear Stearns should not be entitled to seek indemnity for the $160 million disgorgement payment because Bear Stearns enabled its customers to make millions through its trading tactics. The Insurers also argue that there is

---

4. In 2008, Bear Stearns merged with J.P. Morgan. After the merger, Bear Stearns & Co., Inc. became J.P. Morgan Securities Inc. and Bear Stearns Securities Corp. was renamed J.P. Morgan Clearing Corp.

5. The Appellate Division did not separately address Bear Stearns' claims for $40 million in defense costs or the $14 million it paid to settle the private class actions.

a separately applicable public policy category that prohibits insurance coverage for intentionally-caused harm. Aside from these two public policy rationales, the Insurers also invoke two insurance policy exclusions, one applicable to all the Insurers and one limited to an excess carrier.

At the outset, the rules governing CPLR 3211 motions to dismiss are well established. In assessing the adequacy of a complaint under CPLR 3211 (a) (7), the court must give the pleading a liberal construction, accept the facts alleged in the complaint to be true and afford the plaintiff "the benefit of every possible favorable inference" (*AG Capital Funding Partners, L.P. v State St. Bank & Trust Co.*, 5 NY3d 582, 591 [2005] [internal quotation marks and citations omitted]). Whether the plaintiff "can ultimately establish its allegations is not part of the calculus in determining a motion to dismiss" (*EBC I, Inc. v Goldman, Sachs & Co.*, 5 NY3d 11, 19 [2005]). And to prevail on a motion to dismiss pursuant to CPLR 3211 (a) (1), the moving party (here, the Insurers) must establish that the documentary evidence "conclusively refutes" the plaintiff's allegations (*AG Capital Funding*, 5 NY3d at 591).

Analysis of the claims in this action begins with the basic principle that insurance contracts, like other agreements, will ordinarily be enforced as written (*see White v Continental Cas. Co.*, 9 NY3d 264, 267 [2007]). Freedom of contract "is deeply rooted in public policy" (*New England Mut. Life Ins. Co. v Caruso*, 73 NY2d 74, 81 [1989]). As a result, parties to an insurance arrangement may generally "contract as they wish and the courts will enforce their agreements without passing on the substance of them" (*id.*; *see also Slayko v Security Mut. Ins. Co.*, 98 NY2d 289, 295 [2002] [explaining that courts "are reluctant to inhibit freedom of contract by finding insurance policy clauses violative of public policy"]).

Our cases, however, have recognized two situations in which a countervailing public policy will override the freedom to contract, thereby precluding enforcement of an insurance agreement. First, an insurer may not indemnify an insured for a punitive damages award, and a policy provision purporting to provide such coverage is unenforceable (*see Zurich Ins. Co. v Shearson Lehman Hutton*, 84 NY2d 309, 316-317 [1994]). The rationale underlying this public policy exception emphasizes that allowing coverage "would defeat the purpose of punitive damages, which is to punish and to deter others from acting similarly" (*Home Ins. Co. v American Home Prods. Corp.*, 75

NY2d 196, 200 [1990] [internal quotation marks omitted]). Second, as a matter of public policy, an insured may not seek coverage when it engages in conduct "with the intent to cause injury" (*Town of Massena v Healthcare Underwriters Mut. Ins. Co.*, 98 NY2d 435, 445 [2002]; *see also Austro v Niagara Mohawk Power Corp.*, 66 NY2d 674, 676 [1985] ["Indemnification agreements are unenforceable as violative of public policy only to the extent that they purport to indemnify a party for damages flowing from the intentional causation of injury"]).

██ Relying on the findings in the SEC order, the Insurers claim that the latter public policy exception for intentional injury precludes coverage of any of Bear Stearns' claims. The Insurers note that the SEC order determined that Bear Stearns willfully violated numerous federal securities laws through its active facilitation of late trading and market timing activities on behalf of its hedge fund customers. But the public policy exception for intentionally harmful conduct is a narrow one, under which it must be established not only that the insured acted intentionally but, further, that it acted with the intent to harm or injure others (*see Public Serv. Mut. Ins. Co. v Goldfarb*, 53 NY2d 392, 399 [1981] ["Whether such coverage is permissible depends upon whether the insured, in committing his criminal act, intended to cause injury"]). On the limited record before us, we are unable to say, as a matter of law, that this public policy exception clearly bars Bear Stearns' coverage claims. The SEC order, while undoubtedly finding Bear Stearns' numerous securities laws violations to be willful, does not conclusively demonstrate that Bear Stearns also had the requisite intent to cause harm.[6]

The Insurers also maintain—and the Appellate Division agreed—that, on a separate public policy ground, Bear Stearns is not entitled to recover any portion of the $160 million SEC disgorgement payment. Although we have not considered the issue, other courts have held that the risk of being ordered to return ill-gotten gains—disgorgement—is not insurable. Some courts reached this conclusion because, as a matter of contract

---

**6.** Notably, the Insurers did not predicate their dismissal motions on the exclusion in the insurance policy for "deliberate, dishonest, fraudulent or criminal" acts or omissions. The parties apparently dispute whether Bear Stearns' conduct fell within the meaning of this language and, if so, whether the SEC order is a "judgment or other final adjudication"—a prerequisite for the application of the exclusion. We have no occasion to address these questions on this appeal.

interpretive principles, the return of improperly acquired funds does not constitute a "loss" or "damages" within the meaning of insurance policies (*see e.g. Level 3 Communications, Inc. v Federal Ins. Co.*, 272 F3d 908, 910 [7th Cir 2001] [stating that "a 'loss' within the meaning of an insurance contract does not include the restoration of an ill-gotten gain"]; *Vigilant Ins. Co. v Credit Suisse First Boston Corp.*, 10 AD3d 528, 528 [1st Dept 2004] [same]). Others have emphasized that public policy prohibits an insured from receiving indemnification for the disgorgement of its own illicit gains (*see Bank of the W. v Superior Ct.*, 2 Cal 4th 1254, 1269, 833 P2d 545, 555 [1992] ["Otherwise, the wrongdoer would retain the proceeds of his illegal acts, merely shifting his loss to an insurer"]).

■ Bear Stearns does not disagree with these principles, but urges that they do not prohibit coverage here since the bulk of the disgorgement payment—approximately $140 million—represented the improper profits acquired by third-party hedge fund customers, not revenue that Bear Stearns itself pocketed.[7] Put differently, Bear Stearns alleges that much of the payment, although labeled disgorgement by the SEC, did not actually represent the disgorgement of its own profits. It submits that the rule precluding coverage for disgorgement should apply only where the insured requests coverage for the disgorgement of its own illicit gains. On the record before us, we agree with Bear Stearns that the Insurers are not entitled to dismissal of its coverage claim premised on the SEC disgorgement payment.

In the context of these dismissal motions, we must assume Bear Stearns' allegations to be true unless conclusively refuted by the relevant documentary evidence, in this case, the SEC order. Contrary to the Insurers' position, the SEC order does not establish that the $160 million disgorgement payment was predicated on moneys that Bear Stearns itself improperly earned as a result of its securities violations. Rather, the SEC order recites that Bear Stearns' misconduct enabled its "customers to generate hundreds of millions of dollars in profits." Hence, at this CPLR 3211 stage, the documentary evidence does not decisively repudiate Bear Stearns' allegation that the SEC disgorgement payment amount was calculated in large measure on the profits of others.

---

7. There is authority for the SEC's ability to hold one party liable in disgorgement for the improper profits of another (*see Securities & Exch. Commn. v First Jersey Sec., Inc.*, 101 F3d 1450, 1475 [2d Cir 1996], *cert denied* 522 US 812 [1997]).

Moreover, the cases upon which the Insurers rely are distinguishable (*see e.g. Millennium Partners, L.P. v Select Ins. Co.*, 68 AD3d 420 [1st Dept 2009], *appeal dismissed* 14 NY3d 856 [2010]; *Credit Suisse*, 10 AD3d at 528). In each, the insured was barred from obtaining coverage for SEC-ordered disgorgement because the SEC's findings "conclusively link[ed]" the disgorgement payment to improperly acquired funds in the hands of the insured (*Millennium Partners*, 68 AD3d at 420 [internal quotation marks omitted]; *see also Credit Suisse*, 10 AD3d at 529). In other words, they directly implicated the policy rationale for precluding indemnity for disgorgement—to prevent the unjust enrichment of the insured by allowing it to, in effect, retain the ill-gotten gains by transferring the loss to its carrier. In this case, in contrast, Bear Stearns alleges that it is not pursuing recoupment for the turnover of its own improperly acquired profits and, therefore, it would not be unjustly enriched by securing indemnity. The Insurers have not identified a single precedent, from New York or otherwise, in which coverage was prohibited where, as Bear Stearns claims, the disgorgement payment was (at least in large part) linked to gains that went to others. Consequently, at this early juncture, we conclude that the Insurers are not entitled to dismissal of Bear Stearns' insurance claims related to the SEC disgorgement payment.

■ ■ Finally, the Insurers rely on two policy exclusions to bar coverage. One exclusion, applicable to all the Insurers, disclaims coverage for claims "arising out of [Bear Stearns] gaining in fact any personal profit or advantage to which [Bear Stearns] was not legally entitled, including but not limited to any actual or alleged commingling of funds or accounts." Because Bear Stearns alleges, and the SEC order does not conclusively refute, that its misconduct profited others, not itself, this exclusion does not defeat coverage under CPLR 3211. The other exclusion, which relates solely to one excess carrier (Lloyd's), negates coverage for any claim arising from a wrongful act committed before March 21, 2000 (the effective date of the Lloyd's policy) if any officer of Bear Stearns, by that date, "knew or could have reasonably foreseen" that such wrongful act could lead to a claim. But as Supreme Court below noted, "numerous disputed factual assertions remain concerning Bear Stearns' knowledge of the relevant facts prior to March 21, 2000, and whether a person in Bear Stearns' position could have reasonably foreseen that those facts might be the basis of a claim under the Policies" (2010 NY Slip Op 33799[U], *12).

In sum, although we certainly do not condone the late trading and market timing activities described in the SEC order, the Insurers have not met their heavy burden of establishing, as a matter of law on their CPLR 3211 dismissal motions, that Bear Stearns is barred from pursuing insurance coverage under its policies.

Accordingly, the order of the Appellate Division should be reversed, with costs, and defendants' motions to dismiss the complaint denied.

Judges READ, SMITH, PIGOTT and RIVERA concur; Chief Judge LIPPMAN and Judge ABDUS-SALAAM taking no part.

Order reversed, with costs, and defendants' motions to dismiss the complaint denied.