**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 13-1318**

CORNERSTONE TITLE & ESCROW, INC.; SEAN ADETULA,

Plaintiffs – Appellants,

v.

EVANSTON INSURANCE COMPANY,

Defendant – Appellee.

Appeal from the United States District Court for the District of
Maryland, at Baltimore.  William M. Nickerson, Senior District
Judge.  (1:12-cv-00746-WMN)

Argued:  January 29, 2014          Decided:  February 19, 2014

Before AGEE, FLOYD, and THACKER, Circuit Judges.

Reversed and remanded by unpublished opinion.  Judge Agee wrote
the opinion, in which Judge Floyd and Judge Thacker joined.

Stephan Young Brennan, ILIFF, MEREDITH, WILDBERGER & BRENNAN,
P.C., Pasadena, Maryland, for Appellants.  Paul Newman
Farquharson, SEMMES, BOWEN & SEMMES, Baltimore, Maryland, for
Appellee.

Unpublished opinions are not binding precedent in this circuit.

AGEE, Circuit Judge:

The Maryland Attorney General sued Cornerstone Title & Escrow, Inc., alleging that Cornerstone and others engaged in a scheme to defraud homeowners on the brink of foreclosure. In response, Cornerstone sought coverage from its professional liability insurer, Evanston Insurance Company, but Evanston denied any duty to defend under the policy. Cornerstone and its owner then filed a breach-of-contract action against Evanston in the District of Maryland. That court entered summary judgment in Evanston's favor, finding that at least two policy exclusions barred coverage for the underlying action. Cornerstone appealed.

For the reasons explained below, we reverse and remand the judgment of the district court. Not all the claims found in the underlying complaint fall within the two exclusions that the district court identified, so those two exclusions do not defeat Evanston's duty to defend and, by extension, duty to indemnify.

I.

A.

Evanston issued a "Service and Technical Professional Liability Insurance" policy to Cornerstone, which provides that Evanston will pay "the amount of Damages and Claims Expenses . . . because of any (a) act, error or omission in Professional

2

Services rendered . . . or (b) Personal Injury committed . . . by [Cornerstone]." (J.A. 67-68.) The policy also says that Evanston will "investigate, defend and settle any Claim to which coverage under this policy applies." (J.A. 68.) Taken together, these provisions require Evanston to defend and indemnify Cornerstone for covered claims.

This case implicates four of the policy's exclusions:

- Exclusion (a): applying to claims "based upon or arising out of any dishonest, deliberately fraudulent, malicious, willful or knowingly wrongful act or omissions committed by or at the direction of [Cornerstone]." (J.A. 70.).

- Exclusion (n): applying to claims "based upon or arising out of [Cornerstone] gaining any profit or advantage to which [Cornerstone] is not legally entitled." (J.A. 70.)

- Exclusion (x): applying to claims "based upon or arising out of the actual or alleged theft, conversion, misappropriation, disappearance, or any actual or alleged insufficiency in the amount of, any escrow funds, monies, monetary proceeds, or any other assets, securities, negotiable instruments, . . . irrespective of which individual, party, or entity actually or allegedly committed or caused in whole or part the [excluded act]." (J.A. 65.)

- Exclusion (cc): applying to claims "based upon or arising out of the Real Estate Settlement Procedures Act (RESPA) or any similar state or local legislation." (J.A. 66.)

If a "[c]laim" falls within one of these exclusions, then the policy "[d]oes [n]ot [a]pply." (J.A. 69.)


B.

In 2008, the Maryland Attorney General sued Cornerstone and ten co-defendants, alleging that the defendants collectively

violated two Maryland statutes: the Protection of Homeowners in Foreclosure Act and the Consumer Protection Act. According to the complaint, the defendants violated these statutes by scheming to "take title to homeowners' residences and . . . strip the equity that the homeowners ha[d] built up in their homes." (J.A. 109.) The complaint identified thirteen specific property transactions in which the defendants, including Cornerstone, acted wrongfully; it asked the court for a variety of relief, including restitution.

The alleged scheme worked by preying on homeowners close to losing their homes in foreclosure.[1] The "Lewis Defendants" marketed foreclosure-consulting services for a fee and, with the help of a colluding mortgage broker (Thomas), would convince their consulting clients to enter sale-leaseback agreements. Under such an agreement, a homeowner would sell her home to the Lewis Defendants and rent it back. The Lewis Defendants pitched the arrangement as a way to resolve the homeowner's delinquency while allowing the homeowner to rebuild her credit and keep her home. The reality was much different. Once a sale was consummated, the Lewis Defendants would tell a homeowner that unspecified closing fees and charges had consumed any equity

---

[1] As explained below, we assume that the allegations of the underlying complaint are true for purposes of determining whether Evanston owes Cornerstone a duty to defend.

4

proceeds and convince the homeowner to sign her check for the settlement proceeds back to the Lewis Defendants. Then, the Lewis Defendants would charge the homeowner monthly rent payments that were much higher than the original mortgage payments -- driving the homeowner out of her home and ending any chance for her to repurchase it in the future.

Cornerstone "provide[d] settlement services for the sale-leaseback transactions," and the Attorney General alleged that Cornerstone failed to "deliver to homeowners the checks for proceeds due to them at settlement or afterwards." (J.A. 116.) Cornerstone instead "deliver[ed] the homeowners' [unendorsed] checks to the Lewis Defendants or to Defendant Thomas, who deliver[ed] the checks to the Lewis Defendants." (J.A. 116.) The complaint alleged that Cornerstone never "disclose[d] [to the homeowners] the fact that it provide[d] homeowners' checks to other parties" (J.A. 116), and alleged that this failure to disclose amounted to "a failure to state material facts" in violation of the Maryland Consumer Protection Act. (J.A. 129.) In addition, by acting as the settlement agent, "Cornerstone participated in and provided substantial assistance to the . . . [equity-stripping] scheme." (J.A. 129.)

The Attorney General sought to hold Cornerstone responsible not just for its own alleged failure to disclose, but also for its co-defendants' acts. The Attorney General pled that it was

5

the defendants' "concerted action that [made] the enterprise possible" (J.A. 109), so each defendant was "jointly and severally liable" for the acts of every other co-defendant (J.A. 124, 130). Applying this theory, the Attorney General asserted that Cornerstone was liable for a laundry list of statutory violations committed by its co-defendants, including:

- Failing to provide a written foreclosure consulting contract or written sale-leaseback agreement;

- Requiring homeowners to pay a membership fee before receiving foreclosure consulting services;

- Obtaining an interest in a person's home while offering that same person foreclosure consulting services;

- Representing that the services were offered to save a homeowner from foreclosure;

- Failing to disclose the nature of the foreclosure services provided, the material terms of the sale-leaseback agreement, the terms of the rental agreement that followed, and the terms of any subsequent repurchase;

- Failing to disclosure specific terms of the sale-leaseback agreements that statutes require to be disclosed;

- Failing to provide several statutorily required forms and notices in connection with the foreclosure counseling and the sale-leaseback agreements;

- Failing to determine whether the borrower has the reasonable ability to make lease payments and repurchase her home;

- Misleading consumers about whether they are entitled to proceeds of settlement and whether those proceeds would be placed in escrow accounts;

- Taking consumers' settlement checks; and

6

- Recording land deeds and encumbering properties before the homeowners' rescission period expired.

Cornerstone sought coverage under the policy from Evanston, requesting that Evanston defend Cornerstone against the complaint and indemnify it for any liability. Evanston denied coverage. Although Cornerstone denied the Attorney General's allegations, it eventually agreed to a settlement in which it agreed to pay $100,100 in restitution.

C.

In March 2012, Cornerstone sued Evanston, alleging that the insurer breached both its duty to defend and its duty to indemnify under the policy. Cornerstone moved for summary judgment on the duty-to-defend issue and Evanston responded by filing its own cross-motion for partial summary judgment. Among other things, Evanston argued that the Attorney General's suit fell within policy exclusions (a), (n), (x), and (cc) and thus no duty to defend, or indemnify, arose.

The district court granted Evanston's motion for partial summary judgment, denied Cornerstone's cross-motion, and sua sponte entered judgment on Cornerstone's duty-to-indemnify claim. Of relevance here, the court concluded -- based on the "gravamen" of the complaint -- that the Attorney General's complaint "only alleged conduct that meets exclusions of the

7

policy—(n) and (x), at minimum[.]"  Cornerstone Title & Escrow, Inc. v. Evanston Ins. Co., No. WMN-12-746, 2013 WL 393286, at *3, *7 (D. Md. Jan. 30, 2013).  The court stated that misappropriation and illegal gains were "precisely" what the Attorney General alleged in his complaint against Cornerstone. Id. at *7.  Therefore, the district court concluded that Evanston had no duty to defend and, consequently, no duty to indemnify, but did not address exclusions (a) or (cc).

Cornerstone filed this timely appeal, over which we have jurisdiction under 28 U.S.C. § 1291.


II.

The district court decided this case on summary judgment, and we review that decision de novo.  See Turner v. United States, 736 F.3d 274, 280 (4th Cir. 2013).  In doing so, we apply "the same legal standards as the district court and view[] all the facts and reasonable inferences therefrom in the light most favorable to the non moving party," Cornerstone.  Id. "Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Id. (internal quotation marks and citation omitted).

8

As the parties agree, Maryland law applies to this diversity case. The district court focused on the law concerning the duty to defend, correctly reasoning that Evanston would have no duty to indemnify if it had no duty to defend, because the duty to defend is broader. See Cowan Sys., Inc. v. Harleysville Mut. Ins. Co., 457 F.3d 368, 372 (4th Cir. 2006).

In Maryland, the duty to defend "should be construed liberally in favor of the policyholder," Pac. Emp'rs Ins. Co. v. Eig, 864 A.2d 240, 248 (Md. Ct. Spec. App. 2004), and it attaches "when there exists a potentiality that the claim could be covered by the policy," id. (emphasis in original; internal quotation marks omitted). Even a slim possibility can constitute a "potentiality." Compare Walk v. Hartford Cas. Ins. Co., 852 A.2d 98, 106 (Md. 2004) (defining a potentiality as "a reasonable potential that the issue triggering coverage will be generated at trial" (quotation marks omitted)), with Litz v. State Farm Fire & Cas. Co., 695 A.2d 566, 572 (Md. 1997) ("If there is a possibility, even a remote one, that the plaintiffs' claims could be covered by the policy, there is a duty to defend."). And "any doubts about the potentiality of coverage must be resolved in favor of the insured." Cowan Sys., 457 F.3d at 372.

To determine whether the insurer must defend, Maryland courts ask two questions: "(1) what is the coverage and what are the defenses under the terms and requirements of the insurance policy? [and] (2) do the allegations in the [underlying] tort action potentially bring the tort claim within the policy's coverage?" Id. (alterations in original). "The first question focuses upon the language and requirements of the policy, and the second question focuses upon the allegations of the tort suit." St. Paul Fire & Marine Ins. Co. v. Pryseski, 438 A.2d 282, 285 (Md. 1981).

A.

In answering the first question noted above, "[i]nsurance contracts are treated as any other contract, and [Maryland courts] measure such an agreement by its terms." United Servs. Auto. Ass'n v. Riley, 899 A.2d 819, 833 (Md. 2006). We must construe the policy as a whole, and a word should be accorded "its usual, ordinary and accepted meaning unless there is evidence that the parties intended to employ it in a special or technical sense." Clendenin Bros., Inc. v. U.S. Fire Ins. Co., 889 A.2d 387, 393 (Md. 2006) (quotation marks omitted). "In addition, [Maryland courts] examine the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution." Cole v. State Farm Mut. Ins.

10

Co., 753 A.2d 533, 537 (Md. 2000) (quotation marks omitted). "[I]f no ambiguity in the terms of the insurance contract exists, a court will enforce those terms." Nat'l Union Fire Ins. Co. of Pittsburgh v. David A. Bramble, Inc., 879 A.2d 101, 109 (Md. 2005). But "if an insurance policy is ambiguous, it will be construed liberally in favor of the insured and against the insurer as drafter of the instrument," Dutta v. State Farm Ins. Co., 769 A.2d 948, 957 (Md. 2001) (quotation marks omitted; emphasis in original), at least if extrinsic evidence cannot resolve the ambiguity, Clendenin Bros., 889 A.2d at 394. We must find policy language ambiguous if it "suggests more than one meaning to a reasonably prudent layperson." State Farm Mut. Auto. Ins. Co. v. DeHaan, 900 A.2d 208, 226 (Md. 2006).

In interpreting the insurance contract, we should take special care to interpret exclusion provisions narrowly. See Megonnell v. United Servs. Auto. Ass'n, 796 A.2d 758, 772 (Md. 2002). "[S]ince exclusions are designed to limit or avoid liability, they will be construed more strictly than coverage clauses and must be construed in favor of a finding of coverage." Id. (quotation marks omitted). And, in all cases, the insurer bears the burden of showing that an exclusion applies. See Prop. & Cas. Ins. Guar. Corp. v. Beebe-Lee, 66 A.3d 615, 624 (Md. 2013); see also Trice, Geary & Myers, LLC v.

11

Camico Mut. Ins. Co., 459 F. App'x 266, 274 (4th Cir. 2011) (unpublished) (applying Maryland law).

B.

In answering the second question, courts evaluate the "causes of action actually alleged by the plaintiff in [the underlying] lawsuit." Reames v. State Farm Fire & Cas. Ins., 683 A.2d 179, 186 (Md. Ct. Spec. App. 1996); see also Sheets v. Brethren Mut. Ins. Co., 679 A.2d 540, 542 (Md. 1996) ("[W]e must assume that the facts in the [underlying] complaint are true."). We do not consider the merits of the underlying suit at the duty-to-defend stage; "the underlying tort suit need only allege action that is potentially covered by the policy, no matter how attenuated, frivolous, or illogical that allegation may be." Sheets, 679 A.2d at 544 (emphasis in original). The policyholder -- but not the insurer -- may also introduce extrinsic evidence at this step to establish a potentiality of coverage. Aetna Cas. & Sur. Co. v. Cochran, 651 A.2d 859, 866 (Md. 1995).

Finally, and critically, if the complaint at issue contains some covered claims and some non-covered claims, then the insurer must defend the entire action. See Perdue Farms, Inc. v. Travelers Cas. & Sur. Co. of Am., 448 F.3d 252, 258 (4th Cir. 2006) ("Under Maryland's comprehensive duty to defend, if an

12

insurance policy potentially covers any claim in an underlying complaint, the insurer . . . must typically defend the entire suit, including non-covered claims.").

With these basic principles in mind, we consider each of the parties' exclusion-related arguments.

IV.

A.

Evanston first argues that exclusion (n), sometimes called the personal-profits exclusion, defeats coverage. In its view, exclusion (n) applies whenever an underlying action suggests that the policyholder gained an illegal benefit or superior position. Evanston contends that the Attorney General's complaint alleged such an advantage because Cornerstone did not deliver the settlement checks to the selling homeowners, thereby taking part in an equity-stripping scheme.

Even if we were to adopt Evanston's reading of the relevant exclusion, we do not agree with its view of the complaint. Our disagreement leads us to conclude that exclusion (n) does not bar coverage to Cornerstone.

The Attorney General's complaint did not allege that any particular "profit" or "advantage" inured to Cornerstone's benefit, as exclusion (n) requires. To the contrary, the complaint alleged that all the relevant benefits and funds went

13

to the Lewis Defendants and, perhaps, Thomas. It was the Lewis Defendants, after all, who "stripped" the equity from homeowners' homes by contriving false fees and other reasons to obtain the homeowners' settlement proceeds. Evanston admits as much. (See Evanston's Br. 17 ("The result of this scheme allowed the Lewis Defendants to wrongfully take the homeowners' equity." (emphasis added)).) Although Cornerstone collected the settlement proceeds, the complaint does not suggest that it ever retained them. See Perdue Farms, 448 F.3d at 256 n.3 (finding personal-profits exclusion inapplicable where the underlying plaintiffs "never alleged that [the defendant] gained any advantage from its unlawful conduct"). There is no allegation that Cornerstone should not have collected the settlement proceeds because, as a settlement agent, the company was required to do so. Cf. Obligation of Title Insurance Companies to Conduct Annual Review of Settlement Agents, 85 Md. Op. Att'y Gen. 306, 315 (2000) ("Funds are normally escrowed as a part of a real estate settlement."). While the homeowners' equity and money might be an illegal profit or advantage that went to someone after settlement, those assets went to parties other than "the Insured" under the terms of Cornerstone's policy with Evanston.

We also observe that exclusion (n) would not apply because the underlying complaint did not allege illegal profiteering by

14

Cornerstone. Instead, the complaint alleged illegal conduct that produced incidental gains. Put another way: the Attorney General could have succeeded on its claims against Cornerstone without showing that Cornerstone received a single dollar or any other advantage, legal or illegal. In fact, many of the claims for which Cornerstone was allegedly jointly and severally liable did not involve money at all, but instead alleged wrongful disclosures and misrepresentations. (See J.A. 109 (defining Cornerstone as a "Foreclosure Rescue Defendant"); J.A. 126-30 (listing actions for which all Foreclosure Rescue Defendants were responsible).) Cf. Fed. Ins. Co. v. Kozlowski, 792 N.Y.S.2d 397, 403 (N.Y. App. Div. 2005) (explaining that personal-profits exclusion did not relieve insurer of duty to pay defense costs where underlying actions also contained allegations relating to "alleged misstatements and omissions" that were "archetypical of claims that encompass both excluded and covered behavior"). The underlying nondisclosure claims, at a minimum, do not "arise out of" the illegal profit or advantage itself, so those allegations of the complaint do not fall within the exclusion. Perdue Farms, 448 F.3d at 256 n.3 ("[T]he alleged ERISA violations do not 'aris[e] out of' illegal profiteering, because 29 U.S.C. § 1140 proscribes specified conduct, not profit."); see also Brown & LaCounte, LLP v. Westport Ins. Corp., 307 F.3d 660, 664 (7th Cir. 2002)

15

(distinguishing between cases involving "allegations of breaches of fiduciary duty where the dispute concerned the illegality of the actions taken or profits received" and case involving an "unequivocal[] alleg[ation] that [the defendant] reaped an illegal profit").

Though Evanston argues otherwise, it makes no difference that Cornerstone received fees for the settlement services that it provided at closing when the houses were conveyed to the Lewis Defendants. The complaint does not allege that Cornerstone overcharged or that it failed to provide bona fide settlement services. Under the plain terms of exclusion (n), Cornerstone's receipt of legally justified funds does not defeat policy coverage. See, e.g., St. Paul Mercury Ins. Co. v. Foster, 268 F. Supp. 2d 1035, 1045 (C.D. Ill. 2003) (finding personal-profits exclusion inapplicable where policyholder might have been "legally entitled to retain" the funds in question). More importantly, as the district court held in an unchallenged ruling and as Evanston acknowledged at argument, the Attorney General's complaint did not seek damages for the "consideration or expenses paid to [Cornerstone] for services or goods." Cornerstone, 2013 WL 393286, at *5 (alteration in original). Because the Attorney General's claims did not touch upon Cornerstone's settlement fees, those fees could hardly have been a "profit" or "advantage" that spurred the underlying claim.

16

See, e.g., <u>Axis Reinsurance Co. v. Telekenex, Inc.</u>, 913 F. Supp. 2d 793, 803 (N.D. Cal. 2012) (finding personal-profits exclusion did not bar coverage for spoliations sanction even though spoilative act might have also provided business advantage, where court did not premise the sanction on the act creating the advantage); <u>In re Donald Sheldon & Co., Inc.</u>, 186 B.R. 364, 369 (S.D.N.Y. 1995) (holding that exclusion did not apply where the "alleged personal profits . . . were not the basis of the liability for which recovery was sought").

Finally, Evanston has not persuaded us that some undefined personal benefit flowed to Cornerstone merely because the Attorney General sought restitution as a remedy under the complaint. To be sure, a restitution award sometimes suggests that the defendant enjoyed some gain, as "restitution [in the Consumer Protection Act context] aims at disgorgement of unjust enrichment, not compensation for damages." <u>Consumer Prot. Div. v. Morgan</u>, 874 A.2d 919, 953 (Md. 2005). But in a case that involves "concerted action" -- that is, a case like the underlying action here -- the restitution award doesn't necessarily aim to disgorge benefits <u>from particular defendants</u>. Instead, the award serves to disgorge the benefits going to <u>the scheme as a whole</u>. A conspiring Consumer Protection Act defendant will therefore face potential restitution anytime any of his co-conspirators enjoyed some benefit. <u>Id.</u> ("As

17

tortfeasors acting in concert are responsible for the damages each caused, so too are Consumer Protection Act violators who act in concert responsible for the unjust enrichment each gained at the consumers' expense."). A defendant who enjoyed no personal gain could still be ordered to pay restitution if he were part of a broader concerted action that produced benefits to a fellow co-defendant. See, e.g., State v. Cottman Transmissions Sys., Inc., 587 A.2d 1190, 1201 (Md. Ct. Spec. App. 1991) (ordering defendant to pay restitution where another party received improper fees but defendant "indirectly" assisted other party in deception); see also J.P. Morgan Secs. Inc. v. Vigilant Ins. Co., 992 N.E.2d 1076, 1082-83 (N.Y. 2013) (finding that personal-profit exclusion would not apply where disgorgement payment made by defendant "did not actually represent the disgorgement of [the defendant's] own profits," but rather "represented the improper profits acquired by third-part[ies]"). The restitution request therefore does not serve as any guarantee of personal gain on Cornerstone's part.

In sum, the personal-profits exclusion -- exclusion (n) -- does not defeat Evanston's duty to defend and the district court erred in granting partial summary judgment to Evanston in that regard.

18

Alternatively, Evanston references the Attorney General's allegations that Cornerstone misdirected settlement checks and maintains that exclusion (x) also bars coverage. This improper delivery, it says, amounts to conversion.[2] Evanston's argument suffers from a fatal flaw: the improper delivery seen here did not amount to conversion.

In Maryland, the payee of a check (here, the homeowner) must receive the check before he or she can bring a conversion action based on a misuse or improper delivery of it. See Md. Code Ann., Comm. L. § 3-420(a) ("An action for conversion of an instrument may not be brought by . . . a payee or indorsee who did not receive delivery of the instrument either directly or through delivery to an agent or a co-payee."). Where the payee has not received the check, the payee retains a cause of action against the drawer (in this case, Cornerstone) for the liability reflected in the check, but, at least at that point in time, cannot bring a conversion action. See Jackson v. 2109 Brandywine, LLC, 952 A.2d 304, 321 (Md. Ct. Spec. App. 2008). In this case, Cornerstone allegedly misdirected the settlement checks before they ever reached the hands of the homeowners.

---

[2] On appeal, Evanston invokes only the conversion portion of the exclusion.

19

Thus, the necessary element of delivery for a Maryland conversion action to the payee was absent at the time of the allegedly wrongful transfer by Cornerstone.

Even if we could overlook this basic issue and assume that the Cornerstone's act of "improper delivery" fell within exclusion (x), we would still find that other allegations in the Attorney General's complaint are not within the ambit of that exclusion and therefore the duty to defend is triggered. For instance, the underlying complaint faults Cornerstone for failing to disclose certain facts. And, as we have now previously described, the underlying complaint attempts to impose liability on Cornerstone for acts of its co-defendants that have no connection at all to misdirected checks. Among other things, the Attorney General sought to hold Cornerstone responsible for acts such as failing to make required statutory disclosures, recording deeds prematurely, and making misleading statements about the services that the defendants provided. Those claims do not arise from theft, conversion, misappropriation, or any of the other acts described in exclusion (x), and consequently require coverage under the policy.

At argument, Evanston pressed two other points that we need only briefly address. First, Evanston evoked a notion reminiscent of the one that the district court adopted –– that

20

the "gravamen" of the underlying complaint should decide whether it warrants coverage. But as we have already discussed, the well-established rule in Maryland says otherwise. Where covered and uncovered claims arise in the same action, the insurer must defend, regardless of what the gravamen of the action might be. See, e.g., Cont'l Cas. Co. v. Bd. of Educ. of Charles Cnty., 489 A.2d 536, 542 (Md. 1985); Back Creek Partners, LLC v. First Am. Title Ins. Co., 75 A.3d 394, 400 (Md. Ct. Spec. App. 2013); Zurich Ins. Co. v. Principal Mut. Ins. Co., 761 A.2d 344, 348 (Md. Ct. Spec. App. 2000); Balt. Gas & Elec. Co. v. Commercial Union Ins. Co., 688 A.2d 496, 512 (Md. Ct. Spec. App. 1997). Indeed, in Utica Mutual Insurance Co. v. Miller, 746 A.2d 935, 941–42 (Md. Spec. Ct. App. 2000), the Court of Special Appeals of Maryland found that an underlying complaint triggered the duty to defend even though the "gravamen" of that complaint was plainly excluded, where other claims were not. Second, Evanston questioned whether Cornerstone faced a genuine prospect of liability from the acts of its co-defendants. As should be clear by now, we need not answer that question to determine whether the insurer must defend. The insurer has a duty to defend a covered claim even when the claim can be called "frivolous." Back Creek Partners, 75 A.3d at 400.

In short, exclusion (x) also does not defeat Evanston's duty to defend the Attorney General's suit and the district

21

court erred in awarding Cornerstone partial summary judgment in that regard.

C.

Evanston suggests that we affirm on alternative grounds, particularly that exclusions (a) and (cc) exclude coverage. As noted earlier, the district court did not address these policy exclusions. "Although we are not precluded from addressing [alternative grounds for affirmance], we deem it more appropriate to allow the district court to consider them, if necessary, in the first instance on remand." Q Int'l Courier Inc. v. Smoak, 441 F.3d 214, 220 n.3 (4th Cir. 2006); see also United States ex rel. Carter v. Halliburton Co., 710 F.3d 171, 184 (4th Cir. 2013) ("The district court did not reach this argument, having found grounds for dismissal elsewhere. We decline to address this issue for the first time on appeal."). Accordingly, we will remand the case for further proceedings so that the district court can address the parties' arguments as to exclusions (a) and (cc) in the first instance.

V.

For these reasons, we reverse the district court's grant of summary judgment to Evanston on the duty-to-defend issue. Because the district court's decision on the duty-to-indemnify

22

matter rested solely on its erroneous duty-to-defend decision, we must reverse that decision as well. We direct the district court to enter partial summary judgment in Cornerstone's favor on the duty-to-defend issue as to exclusions (n) and (x). We remand for further proceedings consistent with this opinion.

REVERSED AND REMANDED